No. 89,164

STATE OF KANSAS, *Appellee*, v. WALLACE L. DIXON, III, *Appellant*.

112 P.3d 883

Opinion filed June 3, 2005.

*Sarah Ellen Johnson*, assistant appellate defender, argued the cause and was on the briefs for appellant.

*Autumn L. Fox*, special assistant attorney general, argued the cause, and *Phill Kline*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Wallace L. Dixon, III, appeals his convictions of two counts of felony murder, five counts of aggravated battery, two counts of burglary, and one count each of theft, criminal damage to property, aggravated assault, and criminal possession of a firearm. He was sentenced to two consecutive life terms (each with no parole eligibility for 20 years) and 120 months consecutive to the life terms. This is a companion case to *State v. Griffin*, 279 Kan. 634, 112 P.3d 862 (2005).

At approximately 9 a.m. on July 29, 2001, an explosion and fire destroyed a building containing five townhouse apartment units, A through E, at the Eastgate Plaza Apartments in Emporia. Dana Hudson and her infant son Gabriel, who lived in the middle apartment, C, were trapped inside by debris and flames. They died of smoke inhalation and exposure to heat. Other tenants and neighbors were injured. Tena Wright, who lived in apartment A, was injured when she had to jump from a second-floor window, and

two neighbors, James Woodling and Nathan Medlen, were injured trying to help her. Stacey DePriest was upstairs in her apartment, D, when the ceiling fell on her. A neighbor, Rosalind Harris, was injured trying to assist DePriest.

The explosion and fire originated in unit B. Alicia Shaw and her young son lived in unit B. Alicia's sister, Schelese Shaw, and Schelese's son lived in Topeka with Dixon.

Several weeks before July 29, after quarreling with Dixon, Schelese removed her things from his house and went to stay with Alicia. For hours Dixon called Alicia's apartment and the sisters' cell phones and later banged on Alicia's door. He threatened to blow up Alicia's car if Schelese did not come out of the apartment. Schelese returned home with Dixon after 1 day.

At approximately 7 p.m. on July 28, Alicia and some friends drove to Topeka to get Alicia's son, who had been staying with Schelese for a few days. Schelese, Schelese's son, and Alicia's son came out of Dixon's house and got in the car with them. Schelese told her sister that she was leaving Dixon. Schelese had told Dixon that she was just going to get diapers. While the sisters were still in Topeka, Dixon began calling the sisters' cell phones. Schelese then told Dixon that she was going to Emporia to a bar called Fatty's, and he was angry. Instead of going to Emporia, the sisters left their sons with a sitter and went with their friends to a liquor store. Cell phone records showed that Dixon called Schelese's cell phone 95 times in the 15-hour period between 9:11 p.m. on July 28 and 12:12 p.m. on July 29. He called Alicia's cell phone and her apartment phone a total of 20 times during approximately the same period.

Dixon asked some friends to go with him to Emporia. Dixon drove his White Chevrolet Suburban. Rodney Hayes, Jerry Hall, and Ethan Griffin rode with him. They left Topeka for Emporia shortly after 12:20 a.m., when Griffin got off work. They went to Fatty's until it closed and then drove to an after-hours party at a house.

Later, after riding around awhile, they went to the apartment complex where Alicia lived. Dixon told his friends that he had gotten a lot of the belongings in the apartment and he wanted them

back. The four men broke into the apartment. Dixon was angry, and he was barking orders to his friends. Hayes took a television and put it in the Suburban. Griffin took a jewelry box. They also took a video cassette recorder and a lamp.

After putting the belongings in the Suburban, they drove around while Dixon continued to make calls on his cell phone. Hayes complained that he wanted to go back to Topeka. Dixon slammed on the brakes, and he and Hayes jumped out of the vehicle and tried to hit and kick each other. Later, there was a second altercation between Dixon and Hayes. Dixon again slammed on the brakes, and, when he and Hayes got out of the vehicle, Dixon fired his gun at Hayes' feet until it was empty. When they got back in the Suburban, Dixon drove by the Eastgate apartments at least four or five times.

Dixon then drove to a gas station and had Griffin pump gasoline into a bucket. Griffin left the jewelry box at the station. When they left the gas station, the bucket was in the back seat between Griffin and Hall. Griffin heard Dixon say, "I'll burn it up." Hayes, Griffin, and Hall complained about the smell of the gasoline, its sloshing out of the bucket, and that they could not smoke with it in the vehicle. Dixon told Griffin to throw it out the window, and Griffin did.

After driving around some more, Hayes convinced Dixon to go see Donnie Wishon, a friend of Hall. They took the items from Alicia's apartment into Wishon's residence. Hayes and Hall stayed there and went to sleep.

Griffin went with Dixon back to Alicia's apartment. Griffin testified that after again entering the apartment, Dixon went upstairs, threw a candle, knocked over a television, and kicked a bookshelf. Back downstairs, he tore a curtain off a front room window, rifled through the kitchen cabinets, and knocked the stove onto its side. It was full daylight when Dixon and Griffin returned to Wishon's residence to wake up Hayes and Hall and urge them to hurry so they could head back to Topeka.

Peter Lobdell, a special agent, certified explosives specialist, and certified fire investigator with the federal Bureau of Alcohol, Tobacco, and Firearms, led the team that investigated the explosion

and fire. He determined from the large debris field and large sections of intact walls which had been blown out that the explosion was a fuel-air explosion. The fuel was natural gas, which combined with air to support combustion. The source of the natural gas was a leak in the pipe that supplied fuel to Alicia's stove. According to Lobdell, "the supply pipe was manually manipulated," which caused "it to fail, to leak and emit gas into the apartment." He was unable to determine what ignited the fuel-air combination.

Additional facts will be developed as we consider the numerous issues raised by Dixon on appeal.

## 1. DID THE JURY'S FAILURE TO REACH A VERDICT ON AGGRAVATED ARSON AFFECT DIXON'S CONVICTIONS FOR FELONY MURDER AND BURGLARY?

Questions posed by the jury about aggravated arson demonstrate its lack of understanding about whether the defendant had to intend to use fire or explosive to damage property or whether the defendant simply had to intend to damage property and happened to have done so by fire or explosive. The following response, given by the trial judge to one of the questions, is typical of all his responses: "In addition to the required intent to damage, Element number 1 of Instruction 19 requires that you find that the damage occurred by means of fire or explosion." He further advised the jurors to "review all of the instructions as you consider this matter." Among the other instructions was the following: "Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant." The jury was unable to reach a verdict on the aggravated arson count.

Because Dixon was not convicted of aggravated arson, the State takes the position that any question about the offense is moot and not properly before the court. The defendant points out, however, that aggravated arson was a predicate offense for burglary and felony murder. Thus, Dixon contends, the jury's failing to convict him

of aggravated arson ought to be examined relative to the burglary and felony murder convictions.

Dixon was charged with felony murder for the deaths of Dana and Gabriel Hudson. The jury was instructed that the State had introduced evidence on alternative underlying felonies—aggravated arson and burglary. The jury was instructed with regard to the second charge of burglary that the State was required to prove that Dixon knowingly entered a dwelling without authority with the intent to commit theft, aggravated arson, criminal damage to property, or some combination of the three. He was convicted of the second burglary.

Arson is "[k]nowingly, by means of fire or explosive: . . . [d]amaging any building . . . which is a dwelling in which another person has any interest without the consent of such other person." K.S.A. 2004 Supp. 21-3718(a)(1)(A). Aggravated arson is arson "committed upon a building . . . in which there is a human being." K.S.A. 21-3719. The jury was instructed on aggravated arson as follows in accordance with PIK Crim. 3d 59.22:

> "To establish this charge, each of the following claims must be proved:
> 1. That Mr. Dixon intentionally damaged a building or property in which another person had an interest, and that Mr. Dixon did so by means of fire or explosion;
> 2. That Mr. Dixon did so without the consent of Eastgate Plaza, Inc.;
> 3. That at the time there was a human being in the building or property;
> 4. That the fire or explosion resulted in a substantial risk of bodily harm; and
> 5. That this act occurred on or about the 29th day of July, 2001, in Lyon County, Kansas."

Dixon maintains that the correct interpretation of the statutes and pattern instruction is that an accidental fire or explosion ignited as a result of intentional property damage is not aggravated arson because there was no intent to cause a fire or explosion. In other words, he contends that the required intent is the intent to use fire. or explosion to damage property. He cites *State v. Walker*, 21 Kan. App. 2d 950, 910 P.2d 868 (1996), as suggesting the same construction.

Walker was convicted of attempted aggravated arson resulting in substantial risk of bodily harm for pouring gasoline on the

ground in front of the apartment where McCoy, who earlier had poured gasoline on Walker, lived. Walker did not ignite the gasoline and testified that he never intended to do so, but merely wanted to force McCoy to smell gasoline. The Court of Appeals concluded that the legislature had not intended for the arson statute to be interpreted literally. 21 Kan. App. 2d at 954. It reasoned as follows:

"The literal interpretation of the statute would mean that if one pours gasoline on another person's shrubs in front of their house and the shrubs are damaged, he or she has damaged another's property with an explosive, gasoline. Pursuant to [the statute], the person would be guilty of arson. Similarly, if one throws an unlit stick of dynamite through the window of a building, he or she has committed arson. This is true even though the dynamite would not have exploded because the fuse was not lit.

"The question for the jury to decide was whether Walker intended to ignite the gasoline and damage the building by fire or explosion, not whether he intended damage by the pouring of gasoline around the building.

. . . .

"[W]e believe the unmistakable intent of the legislature was that the term 'explosive' was to be interpreted as 'explosion' and that the use of the word 'explosive' was an error in terminology. [Citation omitted.]" 21 Kan. App. 2d at 953-55.

The problem identified in *Walker*, the term "explosive," has been remedied in the pattern instruction and was avoided in the present case by use of the pattern instruction. See PIK Crim. 3d 59.22. The facts in *Walker* paralleled the illustration of an unlit stick of dynamite causing property damage by being thrown through a window. But in the present case, the property damage at issue is not comparable to the broken window but rather to the total destruction of a dwelling by the dynamite's exploding when it landed in a blazing fire. In the first instance, there was an explosive but no fire or explosion; in the second, there was a fire and explosion resulting from the ignition of an explosive. Nonetheless, Dixon would have the court apply the lesson from *Walker* to the facts of the present case to conclude that he could not have been found guilty of aggravated arson because he did not ignite the gas released from the broken supply pipe, nor did he ever intend to ignite it.

Examination of the statutory language does not support Dixon's construction. The legislature defined arson in pertinent part as knowingly, by means of fire or explosive, damaging property. "Knowingly" is an adverb that modifies the verb "damaging," and the phrase "by means of fire or explosive" is set off by punctuation, making it an independent phrase that could be placed elsewhere in the definition. For example: Arson is knowingly damaging any building or property, which is a dwelling in which another person has any interest, by means of fire or explosive without the consent of such other person. If the legislature had intended to require the specific intent to use fire or explosive in order to damage property, it could have expressed that intent by defining arson as knowingly using fire or explosive to damage property.

This court has long held that an accused need not be prosecuted for or convicted of the underlying felony in order to be convicted of felony murder under K.S.A. 21-3401(b). *State v. Beach*, 275 Kan. 603, 617, 67 P.3d 121 (2003); *State v. Wise*, 237 Kan. 117, 123, 697 P.2d 1295 (1985). In such a case, however, a challenge to the felony-murder conviction may be made on the sufficiency of the evidence to support it. In *Beach*, the court framed the issue and concluded as follows:

"The question in this case . . . is whether after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. We conclude that the jury rationally could have found Beach participated in the underlying felony of aggravated robbery. That the jury acquitted Beach of aggravated robbery independent of the felony murder does not impair our conclusion." 275 Kan. at 622.

Here, we conclude that the jury rationally could have found beyond a reasonable doubt that Dixon committed aggravated arson. Thus, aggravated arson could have supported his felony murder and burglary convictions.

## 2. WERE INSTRUCTIONS ON LESSER INCLUDED OFFENSES OF FELONY MURDER REQUIRED?

The defendant requested instructions on reckless second-degree murder and reckless involuntary manslaughter as lesser included

offenses of felony murder. The trial court declined to so instruct on the ground that the evidence of the underlying felonies was neither weak nor inconclusive.

"A trial court should only instruct on a lesser included offense of felony murder when the evidence of the underlying felony is weak or inconclusive. The reason for the rule is that the killer's malignant purpose is established by proof of the collateral felony." *State v. Sandifer*, 270 Kan. 591, Syl. ¶ 3, 17 P.3d 921 (2001).

On appeal, Dixon argues that the evidence of the underlying felony, burglary, was weak and inconclusive. The jury was instructed that it could consider only the second of the two burglary counts, Count 11, as a predicate offense for the felony-murder charges. In closing argument, the prosecutor told the jurors that only the second burglary count could be a predicate offense because only during the second burglary was something done to start the chain of events that ended with the deaths of Dana and Gabriel Hudson. Dixon concedes that there was conclusive evidence that he entered Alicia's apartment the second time, but he disputes that there was conclusive evidence that he entered with a felonious intent. The jury was instructed that it could find that he entered Alicia's apartment with the intent to commit theft, aggravated arson, or criminal damage to property.

Griffin, who accompanied Dixon the second time he went into Alicia's apartment, testified that Dixon threw a candle at a television, kicked a bookshelf, knocked the stove onto its side, tore a curtain down off a front room window, and tore up the kitchen going through the cabinets. Viewed in the light most favorable to defendant, as required, *State v. Gholston*, 272 Kan. 601, 615, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002), Griffin's testimony provided substantial and conclusive proof of Dixon's criminal damage to property. And it could reasonably be inferred from the evidence that Dixon entered the apartment with the felonious intent to criminally damage property. No lesser offense instructions were required.

## 3. SHOULD THE TRIAL COURT HAVE INSTRUCTED ON LESSER DEGREES OF AGGRAVATED BATTERY?

Dixon was charged with five counts of aggravated battery. The jury was instructed for Counts 4, 5, and 9 that the State had to prove that Dixon recklessly caused great bodily harm to Tena Wright, Nathan Medlen, and James Woodling respectively. Counts 4, 5, and 9 are severity level 5 felonies. See K.S.A. 21-3414(a)(2)(A) and (b). For Counts 6 and 7, the jury was instructed that the State had to prove that Dixon recklessly caused bodily harm to Stacey Depriest and Rosalind Harris respectively in a manner whereby great bodily harm, disfigurement or death could be inflicted. Counts 6 and 7 are severity level 8 felonies. See K.S.A. 21-3414(a)(2)(B) and (b).

The defendant requested lesser included offense instructions on Counts 4, 5, and 9. Specifically, defense counsel requested that the jury be instructed on aggravated battery severity level 8 or simple battery. The trial court declined to so instruct on Counts 4, 5, and 9 on the ground that the jury could not reasonably conclude that the injuries of Wright, Medlen, and Woodling constituted anything other than great bodily harm.

A defendant has a right to an instruction and the trial court has a duty to instruct on a lesser included offense which is supported by substantial evidence. Where there is no substantial evidence applicable to the lesser degrees of the offense charged and all the evidence taken together shows that the offense, if committed, was clearly of the higher degree, instructions relating to a lesser degree of the offense are not necessary. *State v. Brice*, 276 Kan. 758, Syl. ¶ 4, 80 P.3d 1113 (2003).

The evidence shows that Tena Wright, whose apartment was next to Alicia's apartment on the north, was upstairs in her bedroom when the explosion occurred. Her daughter was downstairs. The ceiling of Wright's bedroom collapsed on her, and fallen rafters blocked the door so that she was unable to get out to go downstairs. Wright made her way through thigh-deep debris to the window, where she could see her daughter standing on the ground below. The smoke was beginning to get heavy, heat was rising up through the ductwork, and the fire was coming into the bedroom. Knowing that she either had to go out the window or be burned, she chose the window. James Woodling was standing on the fence

below and reaching up for her, but he was unable to hold her. Wright fell against the fence and landed on the air conditioning unit. Her legs and feet were cut and so severely bruised that they became black and swollen to nearly double normal size. Her left side became numb and immobile, and fluid developed in her abdomen. Wright sustained permanent back injuries including a herniated disk, pinched nerve, and inflammation. She took physical therapy for 3½ months and, at the time of trial, was considering spinal injections or back surgery to treat continuing pain.

James Woodling lived next door to the Eastgate Plaza Apartments. When he heard the explosion, he told his wife to call 911 and ran toward the apartments. Woodling and another nearby resident got Wright's daughter out of her apartment. Woodling then got up on the fence to reach up toward the window of Wright's bedroom. As Wright gripped the windowsill, Woodling was able to reach her legs. The building wall was unstable so that Woodling had to push back the wall with one arm and try to hold Wright with the other. He tried to pull her to him as her grip on the sill loosened, but he was only able to slow her momentum as she fell. While he was trying to rescue Wright and hold the wall back, Woodling's back was injured. He suffered two herniated disks in his lower back, which have caused nearly constant pain since that day. At the time of trial, he had begun receiving epidural treatments for his back pain.

Nathan Medlen, another nearby resident who ran to help after the explosion, was told by Wright's daughter that her mother was upstairs. When he got about halfway up the stairs in Wright's apartment, a cylindrical projectile flew through the wall, trapping Medlen's hand between the railing and fallen sheetrock and breaking his fifth metacarpal. He lost his job as a result, and, at the time of trial, he was still receiving some disability benefits and was only able to do light-duty work. The fracture healed so that he has a big lump on the back of his hand.

In *Brice*, 276 Kan. 758, the court considered the recurring question whether a trial court acts properly in limiting a jury's consideration to great bodily harm. The court stated:

"It is a trial court's time-honored responsibility to examine the evidence to determine whether a defendant can be convicted of a lesser included offense. The trial court accordingly guides the jury's deliberations by giving or not giving lesser included offense instructions. . . . Whether there is evidence in the case to support the giving of a lesser included instruction is a determination to be made by the trial court. If there is evidence that the harm was slight, trivial, moderate, or minor, then the trial court must give a lesser included instruction. Thus a trial court could determine that a bullet wound, even one that missed bone, major arteries, veins, and nerves, is not slight, trivial, moderate, or minor and will not support a lesser included instruction for battery." 276 Kan. at 773-74.

Injuries in recent cases where the court affirmed the trial court's determination that an injury was great bodily harm and would not support a lesser included offense instruction include the following: In *State v. Valentine*, 260 Kan. 431, 921 P.2d 770 (1996), the defendant fired four or five shots at the victim. One bullet struck him in the arm, another severed his spine and paralyzed him from the waist down. In *State v. Whitaker*, 260 Kan. 85, 917 P.2d 859 (1996), the defendant shot a police officer in the arm. The bullet did not strike bone. The officer missed 3 days of work on account of the injury. In *State v. Moore*, 271 Kan. 416, 23 P.3d 815 (2001), the defendant used a hot iron to burn his victim's legs, breast, and inner thighs. He was charged with intentionally causing great bodily harm or disfigurement. In *Brice*, the defendant shot his victim in the upper right thigh. Missing bone, major arteries, veins, and nerves, the bullet exited through the victim's right buttock. He missed a week and a half of work as a result of the injury.

In the present case, each of the three victims suffered an injury with long-term effects. Wright had undergone months of physical therapy for a herniated disk and was considering options for further treatment. Woodling had several herniated lumbar disks and had received an epidural injection to treat his pain. Medlen lost his job on account of the injury to his hand and, after many months, was still restricted to light duty. By the measure of lasting effect, the injuries of the victims in this case are more severe than those in *Whitaker* and *Brice* where the victims missed 3 days and a week and a half of work respectively. By any measure the injuries of the victims in this case are not slight, trivial, minor, or even moderate. The evidence would not support lesser included offense instruc-

tions in Counts 4, 5, and 9, and the district court did not err in refusing to give them.

## 4. DID THE QUESTIONS AND COMMENT ON DIXON'S CONTACTING COUNSEL CONSTITUTE PROSECUTORIAL MISCONDUCT?

The prosecutor asked four witnesses about Dixon's telephone calls to and a meeting with his attorney shortly after the explosion and weeks before Dixon was charged and arrested. The timing of the contacts is significant to defendant's complaint because it implies the question of why someone who was not guilty would contact his or her attorney before being arrested or questioned or even contacted by police. The evidence was elicited as follows:

Jerry Hall testified that after he, Dixon, Griffin, and Hayes returned to Topeka the morning of July 29, Hayes and he went to his apartment. Later in the day, Dixon returned to Hall's place. Dixon was nervous and agitated. He called someone trying to find out what was on the Internet about news in Emporia. The prosecutor asked: "Who else did he call?" Hall testified that Dixon called his attorney. The prosecutor asked the attorney's name, and Hall answered that it was Joe Johnson. The following questions and answers occurred:

"Q. Let's talk a little bit about — you said the defendant called his attorney?
"A. Yes.
"Q. Was it your attorney?
"A. No.
"Q. Okay. Did the defendant ask you to go anywhere with him —
"A. Yes, he did.
"Q. — after, the next day?
"A. Yes, he did.
"Q. Where was that?
"A. To his — to his attorney's office.
"Q. That would be Joe Johnson?
"A. Yes.
"Q. Is that an attorney here in Topeka?
"A. In Topeka.
"Q. Did you go to the office with the defendant?
"A. Yes.
"Q. How did you get there?
"A. Wallace [Dixon] came, picked me up.

"Q. And why did he say he needed to go talk to this attorney?

"A. He never really gave a reason, he just — he just said, let's go. will you go with me to talk to my lawyer? Me, him, and Ethan Griffin went.

"Q. Let's talk about when you arrived at the lawyer's office. The defendant drove you there?

"A. Yes.

"Q. Did you meet Ethan Griffin there?

"A. Yes.

"Q. The three of you, did you go·in to talk to the lawyer?

"A. Yes.

"Q. Okay. Did you ever — did you ever retain that lawyer, hire him?

"A. No, I didn't.

"Q. Okay. You walked into where? His conference room? His front room? His office?

"A. His office.

"Q. His personal office?

"A. Yes.

"Q. Did the three of you go in together?

"A. Yes.

"Q. And did you discuss the explosion and fire that had destroyed Alicia Shaw's apartment?

"A. He really didn't come right out and say what he did. He had just said that he did something bad, he think he screwed up this time real bad. And he — his lawyer chewed him out and asked if he was willing to take a lie detector test. And the — the lie detector, everyone said yes except for Ethan.

"Q. Did you — or did he tell the lawyer the truth of what had gone on the night before?

"A. I don't believe so.

"Q. What do you mean by that?

"A. I don't believe he told it because I don't — I don't believe he did.

"Q. Did he lie to his own lawyer at that point?

"A. Yes, because he didn't tell about the fourth person going down.

"Q. Left Rodney out?

"A. Yes.

"Q. Can you tell the jury what the story was that he related to the attorney?

"A. The story was — I gave him a story to tell because he was — he was — his lawyer advised him to talk to the police. So, I gave him a story to tell but I can't remember what it was.

"Q. You were helping him with the story?

"A. Yes, I was."

Defense counsel did not object to this line of questioning.

Kansas Bureau of Investigation Agent William Halvorsen testi-fied as a State's witness about the billing records for the cellular

telephone that Dixon carried on July 28 and the next few days. Halvorsen testified about tracking a number of calls made by Dixon, including the following:

"Q. Did you — did you call any other numbers that you tracked?
"A. Yes.
"Q. What was the next number?
"A. Joe Johnson, an attorney in Topeka. Joe Johnson's home, and Joe Johnson's office.
"Q. Okay. The first call to — or the first to Joe Johnson's home?
[Defense counsel]: Your Honor, I'm going to object on relevance grounds.
THE COURT: Overruled.
"A. The first call to Joe Johnson's home was at 8:48 p.m. on the 29th, and the last call was at 9:09 p.m. on the 1st of August. There were five calls to Mr. Johnson's home, one of which was at 1:19 a.m. in the morning on July the 31st.
"Q. To his home?
"A. To his home, that's correct.
"Q. And what about to Mr. Johnson's office?
"A. Mr. Johnson's office, the first call was at 3:04 p.m. on the 30th of July, the last was at 5:18 p.m. on August the 1st, including five phone calls."

Defense counsel objected, as noted, on the ground of relevance.

The prosecutor asked Dixon's mother, Gwen Rios, about going to Johnson's office. Defense counsel objected, and the trial court overruled the objection. Here is the exchange:

"Q. After a couple of days later did you ever have an occasion to go to attorney Joe Johnson's office in Topeka —
"A. Yes.
"Q. — with your son, the defendant, and others?
"A. I went to Joe —
[Defense counsel]: Your Honor, we would object to any attempt to secure legal counsel as evidence of guilt.
[Prosecutor]: Jerry Hall talked about it, Judge.
THE COURT: I'll allow the question.
"Q. Who was there?
"A. I was there. Well, not till later. My son was there, Jerry Hall, and a third guy, which later I found out was Griffin.
"Q. Ethan Griffin?
. . . .
"A. Yes.
"Q. And you went in to see Mr. Johnson?
"A. Not — later when they called me in there.

"Q. But you didn't initially talk or go in with your son, the defendant, Jerry Hall, and Ethan Griffin to talk to Mr. Johnson?

"A. No."

Ethan Griffin testified that he went to work early on the morning of July 29. Then he was asked and answered the following questions by the prosecutor:

"Q. Was there an occasion after that that you next saw the defendant?

"A. Probably a day or — probably a day or two later I received a phone call from Wallace Dixon, and he was like, I'm in trouble, I'm in some serious stuff. And he said, I'm going to see my lawyer, would you come with me to see my lawyer? And I said I had to wait on my girlfriend to come over, because we were going to go eat somewhere, I believe. So, I told him yes, I'll go up there, but I rode with my girlfriend.

"Q. Did you go up to his lawyer's?

[Defense counsel]: I would object. Comment on the right to counsel.

THE COURT: I don't think that's a problem here. You can proceed.

"Q. Did you go to the lawyer's office?

"A. Yes, I did.

"Q. Who was the lawyer?

"A. Johnson.

"Q. Joe Johnson?

"A. I'm not familiar with his first name. I remember Johnson.

"Q. Okay. Who also was there?

"A. Wallace — it was Jerry Hall, Wallace Dixon, Johnson, and myself, his mother, Wallace Dixon's mother."

In closing argument, the prosecutor commented on Dixon's contacting his attorney: "Who else did he call that morning? Called his — after he got back to Topeka, he called his attorney beginning at 8:48 p.m., 7/29. He called him 10 times, including one call at 1:19 a.m. at his home phone number." In the final portion of his closing argument, the prosecutor directed the jury's attention to a number of Dixon's acts that, according to the prosecutor, showed defendant's consciousness of guilt. The prosecutor did not include Dixon's contacting his attorney among the actions that purportedly showed consciousness of guilt.

On appeal, Dixon argues that in eliciting testimony about his telephone calls and visit to his attorney, the prosecutor was improperly implying that defendant's contacting his attorney showed that defendant was guilty. He relies primarily on cases from other

jurisdictions for the principle that a defendant's guilt may not be implied by showing that he sought the assistance of counsel. See, e.g., *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980) ("It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel.").

The State questions whether the issue was preserved for appeal. As we have seen, no objection was made when the prosecutor questioned Hall. A relevance objection was made when the prosecutor questioned Agent Halvorsen. The State contends that the objective of the examination was to refute defendant's alibi, and the State asserts that testimony concerning defendant's visit to Johnson entirely contradicted his alibi. The State's point is not well taken for several reasons. First, the objection was to questions that elicited Halvorsen's testimony about defendant's telephone calls to his attorney, not the visit to Johnson. In addition, defendant's alibi was an account of where he was during July 28-29, not of his visit to his attorney's office several days later.

Having failed with a relevance objection, defense counsel objected to questions to Rios and Griffin on the ground that it was improper for the prosecutor to attempt to elicit information about defendant's contacts with his attorney. On appeal, Dixon frames the issue as one of prosecutorial misconduct.

Pointing out that an objection must be timely and specific in order to preserve an issue for appeal, see *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001), the State argues that the only effective objections·were made to the prosecutor's questioning of Rios and Griffin, who did not testify that defendant had an attorney-client relationship with Johnson. Although the jury reasonably could have inferred from Rios' testimony about her presence at the meeting at Johnson's office that Johnson was her son's attorney, the questions asked of Rios did not expressly identify Johnson as the defendant's lawyer or ask Rios to so identify Johnson. But Griffin was asked and testified about Johnson being defendant's lawyer. Thus, the jury heard during the questioning of Griffin that he viewed Johnson as Dixon's attorney. More importantly, the establishment of an attorney-client relationship is not an aspect of the issue before

us, which is whether the prosecutor's questioning of witnesses about Dixon's *contacting* an attorney shortly after the incident improperly implied defendant's guilt.

It does not matter whether the objection was to the lack of relevance or otherwise because the rule followed by this court for issues of prosecutorial misconduct maintains the same standard of review whether or not an objection was made at trial. See *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 (2003).

The parties cite no Kansas cases involving a prosecutor's questioning witnesses in order to elicit information about a defendant's contacting his or her attorney. Foreign cases cited by Dixon include the following: *United States v. Liddy*, 509 F.2d 428, 444 (D.C. Cir. 1974); *United States ex rel. Macon v. Yeager*, 476 F.2d 613, 615 (3d Cir. 1973); *McDonald*, 620 F.2d at 564; *Zemina v. Solem*, 438 F. Supp. 455, 466 (S.D. 1977); *People v. Schindler*, 114 Cal. App. 3d 178, 189, 170 Cal. Rptr. 461 (1981); *Riddley v. State*, 777 So. 2d 31, 34-35 (Miss. 2001).

The standard of review generally applied in the foreign cases cited by Dixon is that for constitutional error. In such a review an appellate court considers whether improper references to a defendant's contacting his or her counsel were harmless when measured by a harmless-beyond-a-reasonable-doubt standard. *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). The standard of *Chapman* has long been the standard applied by Kansas appellate courts for constitutional error. See *State v. Faidley*, 202 Kan. 517, 522, 450 P.2d 20 (1969). There is a current statement of that standard in *State v. Thompkins*, 271 Kan. 324, 335, 21 P.3d 997 (2001):

"An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]"

The State bears the burden of proving that a constitutional error was harmless beyond a reasonable doubt. See *State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002).

Framing the issue as suggested by Dixon as a matter of alleged prosecutorial misconduct rather than strictly as constitutional error, however, would comport with Kansas precedent in which prosecutorial misconduct must involve a constitutional violation. In *State v. Pabst*, 268 Kan. 501, 504, 996 P.2d 321 (2000), the court stated that "[r]eversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial." As in *Pabst*, the claimed error may implicate a defendant's right to a fair trial under the Fourteenth Amendment. In other cases, other constitutional rights are implicated. For example, in *State v. Higgenbotham*, 264 Kan. 593, 600-03, 957 P.2d 416 (1998), the court analyzed a prosecutor's statement that defendant claimed was a comment on his failure to testify. And in *State v. Williams*, 268 Kan. 1, 6-7, 988 P.2d 722 (1999), the question was whether the prosecutor subverted the defendant's protection against double jeopardy.

As we have seen, for issues of prosecutorial misconduct, this court's standard of review is whether the error denied the defendant his or her constitutional right to a fair trial, and the court's review is the same whether an objection was or was not made at trial. *Davis*, 275 Kan. at 121-22. "The right to a fair trial is a fundamental constitutional right which the trial court has a duty to protect regardless of a defendant's failure to contemporaneously object." *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999).

Dixon cites *Schindler* for its explanation of the harm caused by the introduction of evidence about a defendant's consulting with counsel. In *Schindler*, the defendant's conviction of killing her husband was reversed due to the prosecutor's attempt to rebut the defense of diminished capacity, *i.e.*, a state of panic, by eliciting testimony of defendant's lucidity during an in-custody interview a few hours after the shooting. 114 Cal. App. 3d at 185-90. The evidence included the officer's statements that defendant declined to make any statement until talking with an attorney and "that he overheard defendant ask her friend who had come to the police station to see if she could get Mr. Geragos for her defense attorney." 114 Cal. App. 3d at 183. In argument, the prosecutor stressed defendant's invocation of her rights and her saying she wanted a

lawyer as counter-indications of a panic state. In addition, the prosecutor made an issue of the particular lawyer defendant wanted. First, the prosecutor told the jurors that defendant wanted Geragos because he had prosecuted the deceased when the deceased had been charged with killing his former wife. Then the prosecutor suggested that defendant's naming Geragos rebutted her defense and undermined the credibility of her stating that she knew little about the death of the former wife. Defendant was represented by Geragos, and his motion for a mistrial on her behalf was denied. In final summation, the prosecutor stated to the jury:

" 'The reason for bringing that statement in about Mr. Geragos is twofold: One, here is a woman that said she didn't know any of the circumstances about the death of Lou Schindler's previous wife, who just got smatters and pieces from people as she went along and who evidently somewhere along the line picked up the idea that Paul Geragos was the prosecuting attorney against Mr. Lou Schindler. Here is a woman who is in a panic state and within this panic state, she has a miraculous ability, this selective amnesia, to turn it off, reach down to the depths of her mind and pull out one attorney and of all of the attorneys in the world she felt could best give her representation that night—we are talking about the night of the killing—and that is Mr. Geragos. Where do you think she pulled that name from? Out of a hat?

" '. . . And this was a few hours after the commission of the act, the act for which she was in a panic state.' " 114 Cal. App. 3d at 184-85.

The California appellate court summarized its ruling as follows:

"Defendant's constitutional rights to due process and against self-incrimination were violated by the admission in evidence (and use in argument) of her responses asserting her *Miranda* rights for the purpose of rebutting her diminished capacity defense. Further, exploitation of her choice of counsel for impeachment and rebuttal of her defense impaired her constitutional right to counsel and constituted prosecutorial misconduct. These errors were prejudicial. Accordingly, we must reverse the judgment. However, since the evidence was sufficient to support the jury's verdict, defendant can be retried for second degree murder." 114 Cal. App. 3d at 185.

For its decision on right to counsel, the California court cited *Griffin v. California*, 380 U.S. 609, 614, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965), which held that a prosecutor's comment on a defendant's failure to testify violated the Fifth Amendment to the United States Constitution by making exercise of the right costly, as being "equally applicable to the constitutional right to counsel."

114 Cal. App. 3d at 188. The California court also discussed its agreement with several cases from lower federal and state courts:

"We agree with the Third Circuit Court of Appeals in *United States ex rel. Macon v. Yeager* (3d Cir. 1973) 476 F.2d 613, 615, which stated: 'For the purpose of the "penalty" analysis, . . . we perceive little, if any, valid distinction between the privilege against self-incrimination and the right to counsel. It can be argued, with equal vigor and logical support, as to either . . . situation . . . that a prosecutor's comment seeking to raise in the jurors' minds an inference of guilt from the defendant's constitutionally protected conduct constitutes a "penalty" on the free exercise of a constitutional right. [Fn. omitted.]'

"In *Macon*, the prosecutor in his summation to the jury commented upon the fact that the defendant called an attorney the morning after the alleged crime and argued that this action cast doubt on the defendant's claim that the shooting was an accident. The *Macon* court held this to be reversible constitutional error, interpreting *Griffin* as an absolute prohibition against the imposition of any penalty for the exercise of a constitutional right in a criminal law context. (*Id.*, at pp. 615-616.)

"Several states have also generally held that a prosecutor cannot properly imply guilt from a defendant's request for counsel. (See, e.g., *People v. Kennedy* (1975) 33 Ill. App. 3d 857 [338 N.E.2d 414, 417-418]; *State v. Kyseth* (Iowa 1976) [240 N.W.2d 671, 674]; *Mays v. State* (Tenn. Crim. 1972) 495 S.W.2d 833, 836.)

"In *United States v. Williams* (D.C. Cir. 1977) 556 F.2d 65, 67, the Circuit Court of Appeals for the District of Columbia pointed out that '[t]estimony about the desire or request for a lawyer is impermissible.' The court noted that a prosecutor is constitutionally precluded from eliciting testimony of a defendant's action in hiring an attorney in view of the tendency of such testimony to serve as the base for an inference of guilt based on such an act.

"Earlier, in *United States v. Liddy* (D.C. Cir. 1974) 509 F.2d 428, that same court indicated that the *Griffin* principle prohibits drawing adverse inferences from not only the fact of hiring an attorney but also the time and circumstances of retaining an attorney. The court specifically warned of the 'mischief of the approach' that allows time and circumstances to be taken into account because it 'raises problems that hobble the right to seek counsel,' inviting 'probing of the very process of selection of counsel-who, why, when and where. . . .' (*Id.* at p. 444.) As the *Liddy* court observed (*ibid.*): 'It would be a rare case indeed where the prosecutor could not point out that the incriminating feature of the employment of counsel . . . rests not in the employment as such but in the time and circumstances surrounding that event, and inferences therefrom that reflect adversely on the defendant. [Fn. omitted.]'

"Recently, in *United States v. Gold* (N.D. Ill. 1979) 470 F. Supp. 1336, the federal district court held that it was improper for prosecutors by questions and comments to draw adverse and incriminatory inferences from a corporation's employment during administrative proceedings and investigation of a particular law

firm which had a nationwide reputation as criminal defense lawyers. The court stated ( *id.*, at p. 1352): 'It is not to be doubted that [the corporation] had the constitutional right to employ counsel of its choice in the administrative proceedings, and certainly to be advised with regard to the criminal investigation. . . . It is improper, where a right is constitutional, for a prosecutor either to question or comment on its exercise. [Citation.] To do so is to make assertion of the right costly. [Citations.] For this reason, in a criminal law context, it is basically unfair for a prosecutor to urge against a person the time and circumstances of his retention of an attorney.' " 114 Cal. App. 3d at 188-89.

The California court reversed Schindler's murder conviction because it concluded that the errors were prejudicial:

"The improper exploitation of defendant's exercise of her constitutional rights to remain silent and to retain the counsel of her choice cannot be deemed harmless error under either the standard stated in *People v. Watson* (1956) 46 Cal. 2d 818 [299 P.2d 243], or the higher standard specified in *Chapman v. California* (1967) 386 U.S. 18 [17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065]. The only issue at trial was defendant's intent and mental capacity at the time of the commission of the offense. The defense evidence was substantial. The rebuttal evidence directly attacked her defense, and the prosecutor's argument that the evidence showed she was fabricating her 'panic' state was most prejudicial. Furthermore, the fact that the jury deliberated 22 hours before reaching a verdict underscores the closeness of the case and the crucial nature of the constitutional violations. (See *People v. Rucker, supra.*, 26 Cal. 3d at p. 391.) The judgment of conviction, therefore, must be reversed." 114 Cal. App. 3d at 190.

In *McDonald*, the Fifth Circuit Court of Appeals found merit in a defendant's claim that "the prosecutor transgressed his Sixth Amendment right to counsel by eliciting testimony that his lawyer was present when Secret Service agents executed a search warrant at his home and by commenting on that fact during closing arguments." McDonald's convictions of dealing in counterfeit currency and conspiring to deal in counterfeit currency were overturned. 620 F.2d at 560, 566. When agents entered McDonald's house to execute a search warrant approximately 4 hours after prior surveillance of an incident at the house, McDonald's lawyer was there with him. The search produced no evidence. Although he admitted knowing of the counterfeiting scheme of Head and Burns, McDonald denied having any part in it. At trial the prosecutor elicited testimony about McDonald's lawyer being present during the search. In closing argument, after discussing evidence of activity

around the house that would have indicated to McDonald that a search of his house was impending, the prosecutor described the agents' entry into the house: " 'And who was there? *The defendant's attorney.*' " 620 F.2d at 562. The prosecutor continued: " 'I suggest to you if Jimmy McDonald knew all this was going on, *and had his lawyer out there* three hours later, I believe that would be sufficient time to dispose of any ashes or any evidence, if you were so inclined.' " 620 F.2d at 562.

The government denied trying to impute guilt by referring to the lawyer's presence and argued that it showed McDonald had time to destroy evidence because he had time to summon his lawyer. Noting other evidence of time to destroy evidence, the court "conclude[d] that the real purpose of the reference to the attorney's presence was to cause the jury to infer that McDonald was guilty. The reference therefore penalized McDonald for exercising his Sixth Amendment right to counsel." 620 F.2d at 564. The court added: "It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel." 620 F.2d at 564. With regard to the government's contention that the infringement of McDonald's right to counsel was harmless error, the Fifth Circuit Court of Appeals concluded that the constitutional right was so basic to a fair trial that the infraction could not be considered harmless error. 620 F.2d at 564. The court continued:

"Comments that penalize a defendant for the exercise of his right to counsel *and that also strike at the core of his defense* cannot be considered harmless error. The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error." (Emphasis added.) 620 F.2d at 564.

The italicized portion of the quote at the end of the preceding paragraph shows that the Fifth Circuit Court of Appeals will reverse a conviction on account of a prosecutor's questioning and comments only where they are directed at the defendant's essential story concerning the crime for which he or she is charged. Because the implication of the prosecutor's references to McDonald's attorney was "that McDonald had destroyed incriminating evidence"

and that implication "struck at the jugular of the exculpatory story, the essence of which was that there was no evidence to destroy," the Fifth Circuit's second requirement for reversal was satisfied. See 620 F.2d at 563.

In *United States v. Liddy*, 509 F.2d 428, the defendant was convicted on charges relating to the burglary and wiretapping of offices of the Democratic National Committee (DNC) in the Watergate complex in the early morning hours of Saturday, June 17, 1972. Liddy was not among the men who were apprehended in the offices, but he was seen outside the building with Howard Hunt shortly after police arrived on the scene. At about 3 a.m. Hunt called an attorney, Caddy, and then went to see him. Caddy testified that Hunt arrived at Caddy's apartment at approximately 3:40 a.m. and arranged with him to secure experienced criminal counsel for the five men arrested in the DNC offices. About an hour later, Hunt called Liddy. Hunt and Caddy explained to Liddy what they had done to retain an attorney for the burglars. "During this conversation, Liddy indicated that he desired to have Caddy represent him in this matter." 509 F.2d at 443. In closing arguments, the government emphasized the unusual hour at which Liddy retained counsel. The trial court instructed the jury that it "could draw no adverse inferences from the fact that Liddy retained counsel but could 'consider the time and other surrounding circumstances at which Mr. Liddy retained Mr. Caddy with respect to the state of mind of Mr. Liddy only.' " 509 F.2d at 443. Basing his allegation of error on *Griffin v. California*, 380 U.S. 609, Liddy argued on appeal "that allowing the jury to draw inferences of guilty knowledge from his efforts to obtain counsel imposes a penalty on the exercise of his Sixth Amendment rights." 509 F.2d at 443. The District of Columbia Circuit Court of Appeals approved the first part of the instruction that prohibited drawing adverse inferences from Liddy's retaining counsel. 509 F.2d at 443-44. The court stated:

"To the extent that an inference of criminality is operative, it invites probing of the very process of selection of counsel—who, why, when and where—and pressing the defendant to come forward with evidence concerning this process. The mischief of the approach is underlined by its semantic subtleties, which opens the

door to maneuver and misunderstanding. It would be a rare case indeed where the prosecutor could not point out that the incriminating feature of the employment of counsel—in the absence of explanation—rests not in the employment as such but in the time and circumstances surrounding that event, and inferences therefrom that reflect adversely on the defendant." 509 F.2d at 444.

In the circumstances of the *Liddy* case, however, the Court of Appeals concluded that the error was harmless beyond a reasonable doubt. The court reasoned that

"the effect of the error was mitigated by the fact that evidence of part of Liddy's 5:00 a.m. conversation with Caddy was clearly admissible to show Liddy's involvement in his action of retaining counsel for those arrested during the break-in. His assertion of a right to Sixth Amendment protection against any use of his statements to obtain counsel for himself certainly does not prohibit inquiry into portions of his conversation with Caddy relating to his action in obtaining counsel for others. This evidence of Liddy's efforts on behalf of the five defendants only a few hours after their arrest was probative of his involvement in their venture." 509 F.2d at 445.

In *Hunter v. State*, 82 Md. App. 679, 573 A.2d 85 (1990), defendant Hunter, after causing a fatal vehicle accident, went to a nearby house to call 911. He also contacted his attorney. In a nonresponsive answer to defense counsel's questioning, a state trooper mentioned that defendant called his attorney. When defendant testified, the prosecutor referred back to the officer's testimony and asked Hunter if he had called his lawyer and then asked him why he called his lawyer. Defense counsel's objection was overruled, and Hunter answered, " 'To see if he would defend me.' " 82 Md. App. at 684. The prosecutor followed up with this question, " 'And the reason you called your lawyer to see if he would defend you is because you were riding down the road with at least a .15 percent ethyl alcohol percentage weight in your blood stream, and you weren't paying attention to your driving, isn't that correct?' " Hunter answered, " 'No.' " 82 Md. App. at 684. The prosecutor concluded his closing argument as follows:

" 'I suggest to you Mr. Hunter was drunk and his negligence caused this accident by his inability to react properly, by his own admission, and lastly, you have Mr. Hunter who talks to his attorney and the last thing he says is "I wanted to talk to my attorney to see if he would defend me." A guilty mind. Thank you.' " 82 Md. App. at 685.

Although agreeing with the outcome of *Macon* and a number of cases that followed it, see 82 Md. App. at 689, the Maryland court disapproved the premise on which those cases rest, *i.e.*, the exercise of a Sixth Amendment right to counsel:

"This raises the question whether the obtention or attempted obtention of a lawyer or legal advice prior to that point can properly be regarded as the exercise of a right under the Sixth Amendment for purposes of a *Griffin* analysis. The harm, of course, occurs at trial, when the evidence is elicited or the comment is made, and surely at that point, the Sixth Amendment right has attached. But as the harm consists of penalizing the earlier exercise of a Constitutional right, one must look back to the event purporting to constitute the exercise of that right. If in fact, or in law, it does *not* constitute the exercise of a Constitutional right, the whole 'penalty' analysis collapses." 82 Md. App. at 690.

Having rejected the *Griffin* analysis but being convinced that evidence of or comment on an early contact with counsel was impermissible, the Maryland court turned its attention to the Due Process Clause of the Fourteenth Amendment and the rules of evidence:

"The right of a person to seek the advice and assistance of counsel is not, of course, restricted to the specific right afforded by the Sixth Amendment or its State counterpart. [Citation omitted.] A person has an independent right, protected we think by the general due process clause of the Fourteenth Amendment and its State counterpart [citation omitted] to seek legal advice or representation at any time, on any matter, and for any reason. This is especially so when the person perceives that civil or criminal litigation against him may be in the offing, as was surely the case here. . . .

"The exercise of this right does not imply a consciousness of guilt. In seeking legal advice or representation, the person may well believe himself culpable of some tortious or criminal conduct. But he may just as well believe himself entirely innocent or only partly culpable, or he simply may not know whether his acts or omissions are in violation of law. And if he has some pre-formed belief as to his culpability or innocence, that belief may turn out to be unfounded. Indeed, common human experience would suggest that, absent some special circumstance not evident here, the most likely purpose for seeking legal advice or representation is to find out what one's status and exposure may be. If there is a rational inference to be drawn from the seeking of such advice or representation therefore, it cannot be more than that—an uncertainty. To draw an inference of consciousness of guilt from the seeking of such advice, then, is both illogical and unwarranted; the fact to be inferred—the consciousness of guilt—is not made more probable (or less probable) from the mere seeking of legal advice or representation, and so evidence

of the predicate fact is simply irrelevant. On pure evidentiary grounds, it is inadmissible." 82 Md. App. at 690-91.

Concluding that it could not say that the error was harmless, the Maryland court reversed the convictions. 82 Md. App. at 691.

In the present case, the State contends that Dixon's right to counsel had not attached when he telephoned and met with Johnson in the days immediately after the explosion and before criminal proceedings had been initiated. The State cites *Liddy* and *Riddley* as making attachment of the right to counsel the threshold requirement. The *Liddy* court, contrary to the State's assertion, did not conclude that the initiation of criminal proceedings was relevant to the analysis. Instead, it concluded that cases involving a prosecutor's commenting on a defendant's request for counsel *upon arrest* were not useful, based on *Griffin*, where the defendant's claim that the jury should not have been permitted to consider when and in what circumstances he contacted an attorney:

"Those cases, though containing language referring generally to the right to counsel, appear to be bottomed on considerations involving the rights of an accused facing police interrogation—a context in which the right to counsel is intimately bound up with the privilege against self-incrimination. They are thus of marginal value in ascertaining the applicability of *Griffin* to the Sixth Amendment claim raised in the present case." 509 F.2d at 443.

The *Riddley* court was evenly split between justices who concluded that Riddley's contact with his counsel was not constitutionally protected because it was made before the defendant's Sixth Amendment right to counsel attached and justices who believed that Riddley's contact with counsel was protected by the Due Process Clause of the Fourteenth Amendment. See 777 So. 2d at 34-36 (majority), 36-39 (dissent).

In *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000), the court prescribed a two-step analysis for alleged prosecutorial misconduct in closing argument. This test was refined in *State v. Tosh* 278 Kan. 83, 91 P.3d 1204 (2004). First, an appellate court decides whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. Second, the court decides whether the remarks "constitute plain error, that is, whether the statements prejudiced the jury against the defendant

and denied him or her a fair trial." *Tosh*, 278 Kan. 83, Syl. ¶ 1. The standard of review discussed and applied in *Pabst* also applies when the complaint is about a prosecutor's cross-examining a defendant. See *Tosh*, 278 Kan. 83, Syl. ¶ 1; *State v. Dean*, 272 Kan. 429, 439, 33 P.3d 225 (2001). No reason appears why the *Pabst* analysis should not also apply when the complaint is of a prosecutor's examining other witnesses and then commenting on their testimonies. In the context of the present case, the two-step analysis would be: First, the court decides whether the complained-of conduct was outside the considerable latitude given a prosecutor in eliciting testimony and commenting on it, and, second, the court decides whether the conduct was so gross and flagrant as to prejudice the jury against the accused and deny him a fair trial.

In this case of first impression for Kansas courts, defendant has relied on cases from other jurisdictions. Of those brought to the court's attention by Dixon and independent research, all but one concluded that eliciting testimony and commenting on a defendant's contacting counsel are beyond the latitude afforded the prosecution. Only the Mississippi court in *Riddley* concluded otherwise, and that court affirmed the defendant's conviction on an even split, with those favoring affirmance rejecting a Sixth Amendment claim and declining to consider the issue as a matter of fundamental fairness. All the other courts reasoned that a prosecutor is constitutionally precluded from eliciting testimony of a defendant's contacting an attorney and commenting on it on account of the potent tendency of the evidence and comment to serve improperly as the basis for an inference of guilt. We conclude that it was improper for the prosecutor by questions and comments to draw incriminatory inferences from defendant's constitutional right under the Fourteenth Amendment to employ counsel as an element of the right to a fair trial. We further agree with the Maryland court that such evidence of "obtention or attempted obtention of a lawyer or legal advise" is irrelevant and inadmissible.

The remaining question is whether the conduct prejudiced the jury against the accused and denied him a fair trial. This step requires a particularized harmlessness inquiry for prosecutorial mis-

conduct cases, as stated in *Tosh*, 278 Kan. 83, Syl. ¶ 1. We consider three factors:

"(1) Whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of jurors. None of these factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met." *Tosh*, 278 Kan. 83, Syl. ¶ 2.

Viewing the prosecutor's conduct in light of the trial record as a whole, as required, we find that the prosecutor's eliciting testimony from multiple witnesses and then commenting on it in closing argument improperly highlighted defendant's conduct for the jury on five separate occasions. The prosecutor's repeated references to defendant's contacting counsel certainly appears to have been intended to imply that only guilty people contact their attorneys and to cause the jurors to infer guilt on that basis. In these circumstances, the prosecutor's conduct amounted to a flagrant violation of Dixon's right to a fair trial in that the conduct penalized him for exercising his right. The jury could have found, based on other evidence, that Dixon was guilty. The jurors, however, also might have decided Dixon was guilty because the prosecutor implied that defendant must be guilty by repeatedly eliciting testimony and commenting on defendant's contacting counsel. Under such circumstances we cannot conclude that such error was harmless.

## 5. DISTRICT COURT'S REFUSAL TO GRANT DIXON'S MOTION FOR MISTRIAL.

Defendant requested a mistrial after hearing the testimony of Dr. Mario Gomez. The motion was overruled.

The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). Declaration of a mistrial is a matter entrusted to the trial court's discretion, and the decision will not be set aside on appeal unless an abuse of discretion is clearly shown. The defendant has the burden of proving that he or

she was substantially prejudiced. *State v. Deal*, 271 Kan. 483, Syl. ¶ 2, 23 P.3d 840 (2001).

On appeal, Dixon contends that his defense was hampered when Gomez testified inconsistently with his written report because in hiring experts Dixon relied on Gomez' written report. During discovery, Dixon received a written report from Gomez stating that there were two possible sources for the gas leak—a burner of the stove or a break in the flexible hose connecting the range to the wall outlet. At trial, Gomez testified that he did not mean just the flexible hose, "Actually, what I meant is a complete assembly that is now Exhibit 70, not the flexible part because I already see the flexible part and it's intact, so there's nothing there I can say would help me. I was referring to the assembly of the flexible pipe, the tube plus the pipe."

In support of the motion for mistrial, defense counsel told the trial court:

"When we received this report we told our metallurgist that we had consulted with that he would no longer be needed because the State was not proceeding on a theory that the rigid pipe had been broken, releasing the natural gas, or at least they were not presenting expert testimony to that effect. We based that on the just plain language of the report."

Defense counsel added:

"Dr. William Arnoult [a metallurgist] drafted this affidavit so that we could . . . subject State's Exhibit 70 to scanning electron microscopy. We called all over trying to find a facility to do that and then we received this report, and he at this point would say that he lacks sufficient information from the materials we sent him for him to draw any conclusion. And it would have been a costly endeavor for him to get that and so that's why we quit."

The State said that its offers to allow defense counsel to have the pipe examined were refused and that it had made Gomez available. The State also suggested that Gomez' imperfect English might account for some imprecision in his report. Defense counsel conceded that the pipe assembly had been offered to him for inspection. At the State's suggestion, the trial court examined Agent Lobdell's preliminary hearing testimony. Lobdell testified at the preliminary hearing that the vertical supply pipe through the

kitchen floor had been broken off at its threads where it was joined with the horizontal supply pipe just under the kitchen floor.

The trial court's ruling was issued from the bench:

"THE COURT: This second motion for mistrial hinges upon provisions in Dr. Gomez's report, and significantly I think it refers to his conclusion number 5, which says, quote, alternatively, NG, referring to natural gas, flow may have started by voluntary or accidental breaking of the flexible hose connecting the range to the wall outlet, end quote. If I'm understanding defense counsel's argument correctly, that argument is that because of the use of the term 'flexible hose' there the defendant terminated efforts to verify or to evaluate the claim that there had been a crack occur in the threads of the rigid or solid wall pipe that is also part of this gas line assembly from the gas supply line. Did I get that right?

"[DEFENSE COUNSEL]: Your Honor, we understood there was a crack there between the rigid and the union. The question is whether that crack was the reason that natural gas was emitted, that is, whether it occurred before or after the explosion.

"THE COURT: I understand. Okay. Well, in any event, the motion is going to be denied. Under the circumstances it appears that this case has always been pretty much tried on the premise that this defendant was responsible for the creation of a crack that occurred at the joint between the rigid supply line and the — what I call the gas pipe riser, which is also a rigid gas pipe, where it's threaded together. Now, Dr. Gomez's report refers to the flexible hose, which he now indicates he calls the whole assembly, which includes a part flexible line and part rigid line, but it also refers to the wall outlet, which there is no wall outlet, it comes up through the floor. Everybody has agreed to that. Under those circumstances, I don't think that this report so significantly misled anyone that I would call it the basis for a mistrial under these circumstances. I think it's already been clear what the State's contention was where the crack occurred and the circumstances of the claim on the part of the State. So, . . . the motion is denied."

As noted by the trial judge, in planning a defense strategy Dixon had Lobdell's preliminary hearing testimony to take into account, as well as Gomez' report. He should have been aware from the reference to a wall outlet that Gomez' report contained some imprecise language; he had been offered access to Gomez and to Exhibit 70, the gas pipe assembly. We agree with the trial court that in these circumstances the defendant should not have been significantly misled. What prejudice Dixon may have suffered, if any, from Gomez' including the supply pipe along with the flexible hose in his trial testimony resulted from defendant's being less able to cast doubt on the State's theory by playing up the difference

between the opinions of Gomez and Lobdell. This would not be substantial prejudice so as to support a motion for mistrial. In these circumstances, Gomez' including the supply pipe along with the flexible hose in his trial testimony but not in his report was a matter for cross-examination rather than a mistrial. The trial court did not abuse its discretion in denying defendant's motion.

### 6. WAS DIXON DEPRIVED OF HIS RIGHT TO A PUBLIC TRIAL?

The trial of Ethan Griffin, who was charged with nearly all the same charges as Dixon, was scheduled to begin as soon as Dixon's trial was over. Griffin and Dixon could not be tried simultaneously because there was only one prosecution team. The jury for Griffin's trial was chosen before Dixon's trial concluded. Although it had been sworn to tell the truth during voir dire, at the time the Dixon verdicts were returned the Griffin jury had not been sworn and empaneled for the trial. In order to prevent the Griffin jury's deliberations from being tainted by information about the Dixon verdicts, the trial court closed the courtroom to media and spectators before reading the Dixon jury's verdicts. Defense counsel objected. In addition to the Dixon jury and court staff, only the defendant, counsel, and Dana Hudson's parents were allowed to remain in the courtroom while the verdicts were announced. After the verdicts were read, the trial judge told the jurors that they could not disclose their verdicts "until such time as I have directed that [they] may be disclosed in order to try and prevent any undue influence on the subsequent trial that we're about to start tomorrow. And I have said that [these] verdict[s] would be released once I got the jury impaneled and sworn, which I expect to probably occur before noon tomorrow." In ruling on this issue, the trial judge announced that as soon as he had the Griffin jury "subject to [his] direct control," he would release the verdicts and make available a complete transcript of the proceeding.

On appeal, Dixon concedes that the trial court's concern about jury contamination in Griffin's trial was legitimate and that criminal proceedings may be closed in certain circumstances. As the United States Supreme Court stated in *Waller v. Georgia*, 467 U.S. 39,

45, 81 L. Ed. 2d 31, 104 S. Ct. 2210 (1984), "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care." The court's review of this question of law is unlimited. See *State v. White*, 275 Kan. 580, 597, 67 P.3d 138 (2003).

The State does not suggest that a defendant's right to a public trial does not apply to announcement of the verdict. The question in *Waller* was whether a defendant's right to an open trial applied to a suppression hearing, and the Supreme Court concluded that it did. 467 U.S. at 43, 48-50. The only instance in which *Waller* has been cited in a Kansas case is *State v. Kleypas*, 272 Kan. 894, 930, 40 P.3d 139 (2001), where it was cited for another principle—that only improperly seized evidence need be suppressed. Dixon cites several New York cases in which new trials were granted because the courtroom was closed following presentation of the evidence. See, *e.g., People v. Singh*, 287 App. Div. 2d 748, 749, 732 N.Y.S.2d 415 (2001), in which the defendant's right to an open trial was said to apply where the courtroom was closed from the time the jury was instructed to the end of the proceedings. Dixon also cites *People v. Martinez*, 172 App. Div. 2d 428, 568 N.Y.S.2d 940 (1991), in which the defendant's family was removed from the courtroom before announcement of the verdict.

In *Waller*, the Supreme Court stated that "under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors." 467 U.S. at 47. In *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 509-10, 78 L. Ed. 2d 629, 104 S. Ct. 819 (1984), the Supreme Court quoted *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-07, 73 L. Ed. 2d 248, 102 S. Ct. 2613 (1982), as follows:

" '[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial

is necessitated by a compelling governmental interest and is narrowly tailored to serve that interest.' "

The Supreme Court continued:

"The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S. at 510.

Dixon contends that the decision to close announcement of the verdicts in this case did not satisfy the *Waller* test because the trial court failed to consider reasonable alternatives to closure. Dixon argues that the trial court could and should have gone ahead and sworn in Griffin's jury in order to subject it to the trial judge's direct control and instructed it to avoid media coverage of the verdicts in Dixon's trial. Defense counsel did not suggest this or any other alternatives to the trial judge. Dixon further argues that any exposure to information about the verdicts in Dixon's trial could have been cured for Griffin by replacement of jurors. Contrary to Dixon's contention, the trial judge did consider the possibility of selecting new jurors for Griffin's trial:

"Item Number 4, change of venire. Basically that means pick a different jury pool. I would challenge anyone in this courtroom to go out and find a different jury pool than what we found. That jury pool was selected as randomly as any one. The publicity would have the same effect on the jury pool. I can't go out and find a different 50,000 people to try and select a jury pool from. That's not an option available to me, and that is cold hard fact.

"Next issue or next option available to me is intense *voir dire*. We had that, and as far as I'm concerned counsel will have another opportunity to ask questions. I don't know what the result of those questions is going to be. The point is, at this point in time I cannot make a factual conclusion to the contrary that the extent of this publicity, which has been intensive and daily, has not had some effect.

"The next item is additional peremptory challenges. I think I have accommodated that as well in that we have provided for additional alternate jurors when we bring that second jury panel in to choose from in the event that we do have some leave. So, I have considered and adopted that standard as well."

Although it does not appear that the trial court expressly considered the specific possibility of swearing in Griffin's jury before hearing the Dixon verdicts, as defendant now advocates, in the

extensive findings made by the trial court it is apparent that the required consideration was given to whether the closure was necessitated by a compelling governmental interest. The outline of the trial court's analysis was drawn from the reasonable alternative means noted by this court in *Kansas City Star Co. v. Fossey*, 230 Kan. 240, 249, 630 P.2d 1176 (1981): " '(1) continuance, (2) severance, (3) change of venue, (4) change of venire, (5) intensive voir dire, (6) additional peremptory challenges, (7) sequestration of the jury, and (8) admonitory instructions to the jury.' " The court was quoting from the commentary to Fair Trial and Free Press: Standard 8-3.2, which was adopted by the American Bar Association's Standing Committee on Association Standards for Criminal Justice in August 1978 and adopted by this court in July 1981. 230 Kan. at 247-48, 251.

Upon concluding that closure is necessitated by a compelling interest, the *Waller* standard requires the trial court to narrowly tailor the closure order to serve that interest. In this case, the trial judge closed the courtroom for the reading of the verdicts, but announced his intention to disclose the information the following day when Griffin's jury was in place. There is no suggestion by the parties that his intention was not carried out.

This case is readily distinguishable from the New York cases relied on by Dixon. In both, the trial court closed the courtroom without inquiring whether there was any reason to do so. In *Martinez*, the New York Supreme Court stated that

"the failure to record any purported compelling reasons justifying closure precludes a proper review by this court and mandates a reversal of defendant's conviction. [Citations omitted.] A courtroom may be closed where an overriding interest to preserve higher values is demonstrated (*see, Waller v. Georgia*, 467 U.S. 39; [citation omitted]). However, this interest must be articulated along with findings that are specific enough to permit a reviewing court to determine whether closure was warranted. [Citation omitted.]" 172 App. Div. 2d at 429.

In the present case, in contrast, the trial court went to great lengths to articulate the interest to be served by closure as well as its findings on reasonable alternative means.

Dixon also cites *United States v. Canady*, 126 F.3d 352 (2d Cir. 1997), *cert. denied* 522 U.S. 1134 (1998). The constitutional prob-

lems in *Canady* eclipsed that of a closed courtroom in that the defendant first learned of his conviction by reading a newspaper. Hence, the defendant's right to be present at all stages of a criminal proceeding was at the heart of his appeal along with his right to a public trial. At the close of the evidence in Canady's bench trial, the trial judge announced that he would read some cases and write an opinion. Instead of reconvening court for delivery of the verdict, the trial judge filed the opinion and mailed copies to the parties. The federal Court of Appeals found error in the failure of the district court to announce its verdict in open court in the presence of the defendant. 126 F.3d at 362-63.

We conclude in the present case that it was error for the trial court to close the courtroom for announcement of the verdicts. Having so concluded, we must determine if such error was harmless. The discussion of harmless error in *Canady* is instructive. The federal court stated: "This is a critical inquiry because, if harmless error analysis is applicable, we have little doubt that the verdict would be the same and that therefore the error would be harmless." 126 F.3d at 363.

The federal court continued:

"While there are some errors to which harmless error analysis does not apply, 'they are the exception and not the rule. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis.' *Rose v. Clark*, 478 U.S. 570, 578-79, 106 S. Ct. 3101, 3106, 92 L. Ed. 2d 460 (1986) (citation omitted). Nonetheless, there are 'some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' *Arizona v. Fulminante*, 499 U.S. 279, 308, 111 S. Ct. 1246, 1264, 113 L. Ed. 2d 302 (1991) (plurality opinion). These so-called 'structural errors' are 'defects in the constitution of the trial mechanism' which affect the 'entire conduct of the trial from beginning to end,' and include, *inter alia*, 'the absence of counsel for a criminal defendant,' 'the presence on the bench of a judge who is not impartial,' and 'the right to a public trial.' *Id.* at 309-10, 111 S. Ct. at 1264-65.

"While the Court in *Fulminante* listed the deprivation of the right to a public trial as a 'structural error,' we have recognized that not every violation of that right is free from harmless error review. *See, e.g., Rushen [v. Spain]*, 464 U.S. [114,] 118-19, [78 L. Ed. 2d 267, 104 S. Ct. 453 (1983)] (finding *ex parte* communication between judge and juror to be harmless); *Yarborough v. Keane*, 101 F.3d 894, 898 (2d Cir. 1996) (holding that defendant's exclusion from hearing to question witness was harmless because hearing was 'extremely brief,' 'not even a part of

the trial proper,' and 'of little significance'), *cert. denied,* 520 U.S. 1217, 117 S. Ct. 1706, 137 L. Ed. 2d 831 (1997); *cf. Peterson v. Williams,* 85 F.3d 39, 44 (2d Cir.) ('trivial' and 'inadvertent' closure of trial during defendant's testimony did not violate public trial guarantee), *cert. denied,* 519 U.S. 878, 117 S. Ct. 202, 136 L. Ed. 2d 138 (1996). Nonetheless, the rendering of the court's decision, following a criminal bench trial, is qualitatively different from these minor violations of the public trial guarantee.

"The announcement of the decision to convict or acquit is neither 'of little significance' nor 'trivial;' it is the focal point of the entire criminal trial. To exclude the public, the defendant, the prosecution, and defense counsel from such a proceeding—indeed not to have a proceeding at all—affects the integrity and legitimacy of the entire judicial process. *Accord Guzman v. Scully,* 80 F.3d 772, 776 (2d Cir. 1996) ('[I]t is well-settled that a defendant whose right to a public trial has been violated need not show that he suffered any prejudice, and the doctrine of harmless error does not apply.'). 'While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real.' *Waller,* 467 U.S. at 49 & n. 9, 104 S. Ct. at 2217 & n. 9 ('defendant should not be required to prove specific prejudice in order to obtain relief' for violation of public trial right). In view of our long history of public open trials, we hold that the failure to publicly announce in open court the decision following a criminal bench trial is an error of constitutional dimension that affects the framework of the trial itself and is not subject to harmless error review. *But see [United States v.] Huntley,* 535 F.2d [1400,] 1404 [(5th Cir. 1976)] (pre-*Fulminante* case subjecting trial court's failure to announce verdict publicly to harmless error analysis)." *Canady,* 126 F.3d at 363-64.

Here, the trial court considered the advocated interests and the alternatives. The trial court exercised care in striking a balance of those interests. But the court's decision was made in response to intervention by area newspapers, whose interests were the First Amendment interests of media freedom. Although defense counsel made a simple statement of objection to closing the courtroom, the Sixth Amendment interest in a public trial seems not to have been pressed. The trial judge's statement of the interests balanced was that "it appears to me that there is a greater danger that a disclosure of the jury verdict would prejudice [Griffin's] right to a fair trial than there is a danger to the rights of the public to receive this information." However, it was Dixon's right to a public trial that is at issue here.

Because the reasonable and seemingly obvious alternative of empaneling and swearing Griffin's jury was available but not utilized,

the closure was not warranted and thus the trial court erred. As previously noted, an error of constitutional magnitude may not be held to be harmless unless the appellate court can declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Boldridge*, 274 Kan. 795, 808, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003). As the federal court noted in *Canady*, there is no question that the error would not have changed the verdicts because the verdicts had already been reached. The lack of effect on the verdicts, however, should not necessitate the conclusion that the error was harmless where the trial court's closing the courtroom was inconsistent with substantial justice. We find the rationale of the court in *Canady* persuasive and conclude that the closure was inconsistent with the substantial right of Dixon to a public trial and not harmless error.

## 7. JURY INSTRUCTIONS FOR THE BURGLARY CHARGES.

Dixon was charged with two counts of burglary, one for each time he entered Alicia Shaw's apartment in the early morning hours of July 29. For each count, the jury was instructed as follows:

"To establish this charge, each of the following claims must be proved:
"1. That Mr. Dixon knowingly entered or remained in a building which is a dwelling;
"2. That Mr. Dixon did so without authority;
"3. That Mr. Dixon did so with the intent to commit a theft, and/or aggravated arson, a felony, and/or criminal damage to property, a felony, therein; and
"4. That this act occurred on or about the 29th day of July 2001 in Lyon County, Kansas."

For the instruction on the first burglary, defense counsel objected on two grounds—that there was no evidence of any intent to commit aggravated arson and that a multiple acts instruction was needed. The State responded with regard to evidence of an intent to commit aggravated arson that defendant's statements about stuff going up in flames were sufficient to show his intent to enter Alicia's apartment to commit arson. The trial judge refused to give a multiple acts instruction on the ground that the burglary presented

an alternative means issue rather than a multiple acts issue. He also rejected defendant's objection to the lack of evidence:

"[T]he evidence of an intent to commit aggravated arson on the first burglary is extremely weak. As I recall, there was a lot of discussion as to when this gas was purchased and when these statements were made that are supposedly attributed to the defendant about things going up in flames and that type, and the jury could certainly conclude that that occurred after the first entrance but prior to the second entrance or it could conclude that it was prior to the first entrance into the apartment. But again all we're dealing with is an intent here, not the actual carrying out of the act, and so I'm going to allow it to go as charged because the State is entitled to present to the jury all theories of its case."

On appeal, there are two parts to Dixon's argument. The first is his right to a unanimous verdict. Dixon argues that the jury should have been required to unanimously agree on the intent with which he entered Alicia's apartment. He concedes that jury unanimity is not required as to which of alternative means by which a crime was committed, but he argues that the rule ought to be changed. The rule has been confirmed at least as recently as March 2004 in *State v. Morton*, 277 Kan. 575, 86 P.3d 535 (2004). There is no merit to the first part of the argument. For the second part, Dixon argues that there is no evidence that he entered Alicia's apartment with the intent to commit aggravated arson. The State fails to address the issue of evidence of intent to commit aggravated arson.

For the proposition that the trial court's including alternative means for which there is no evidence requires reversal of his burglary convictions, Dixon cites *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994), where the court stated: " 'Unanimity is not required, however, as to the means by which the crime was committed *so long as substantial evidence supports each alternative means.*' [Citations omitted.]" (Emphasis added.) " 'In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.' [Citations omitted.]" *State v. Hoge*, 276 Kan. 801, 813, 80 P.3d 52 (2003) (quoting *Timley*, 255 Kan. at 289).

The trial judge seems to have believed there was a dispute about whether the bucket of gasoline was purchased before or after the

first burglary, but Hall, Hayes, and Griffin all testified that it was purchased after the first burglary and before Hall and Hayes were taken to the residence of Hall's friend. The time indicated on the receipt for the gasoline was 4:23 a.m., and Hall testified that he thought the first burglary occurred an hour or two after Fatty's closed at 2 a.m. The trial judge also seems to have believed that there was evidence of defendant's making statements "about things going up in flames" that the jury could conclude were made before the first burglary. The evidence the trial judge had in mind, however, seems to be Griffin's testimony, which is linked to the bucket of gasoline. The pertinent questions and answers were as follows:

"Q. [Prosecutor:] Did the defendant ever say what his plan was with the gasoline, the defendant?

"A. [Griffin:] No, he didn't.

"Q. Okay. I want you to go to 00 — get the other notebook here. On the second page, go to 00:35:42.

"A. 35:42? 00:35:42?

"Q. Yes, sir. Would you read a couple of lines past that, as well?

"A. (The witness complied with the request.)

"Q. Did the defendant tell you what his plan was with the gasoline?

"A. No, he didn't. I overheard Wallace Dixon say he would burn her — he would burn up the yard or burn the apartment.

"Q. Referring to the gasoline?

"A. Maybe, yes.

"Q. Would you read or read it to yourself and try to give us the exact quote that Wallace Dixon gave you?

"A. That I overheard?

"Q. Yes.

"A. He didn't — I heard — what I heard is, I'll burn it up, and that's when all the commotion had started and that's when I threw the gas out the window.

"Q. And what happened after that? After you got the gas and you guys threw it out the window what did you do?

"A. We went to Donnie Wishon's house."

Wishon is Hall's friend in Emporia. As we have seen, the evidence shows that the bucket of gasoline was purchased after the first burglary and before Hall and Hayes were taken to the residence of Hall's friend.

From this review of the evidence, it does not appear that a rational trier of fact could have found that Dixon had the intent to

commit aggravated arson the first time he entered Alicia Shaw's apartment on July 29, 2001.

Dixon also asserts that there is not sufficient evidence to support the instruction on entering the apartment with intent to commit criminal damage to property. This argument was not presented to the trial court.

For the instruction on the second burglary, defense counsel objected on two grounds—that there was no evidence of intent to commit theft or criminal damage to property and that a multiple acts instruction was needed. The trial court simply stated that "[t]hose objections have been noted and overruled." On appeal, Dixon argues there is no evidence that he entered Alicia's apartment the second time with the intent to commit theft. The State fails to address the issue of evidence of intent to commit theft. Nothing in the testimony of Griffin, the only person who reentered Alicia's apartment with Dixon, seems to indicate that theft was an intent.

The nonexistence of direct evidence of Dixon's intent does not end the inquiry. Intent, a state of mind existing at the time the offense is committed, does not need to be and rarely can be directly proven. It may be established by acts and circumstances and inferences reasonably deducible from evidence of acts and circumstances. See *State v. Wilkins*, 269 Kan. 256, 264-68, 7 P.3d 252 (2000). In *Wilkins*, we held the evidence was sufficient to convict the defendant of burglary where the evidence was that he was found in a pawn shop, having broken in through a hole in the roof. 269 Kan. at 264. In the present case, there was a second entry into the apartment and from the evidence of his unlawful conduct in the first entry it could reasonably be inferred that Dixon intended to continue such conduct during the second entry.

The remaining question is whether Dixon's burglary convictions can stand in spite of the absence of evidence sufficient to support each theory for the burglary charges. In *State v. Johnson*, 27 Kan. App. 2d 921, 923-26, 11 P.3d 67, *rev. denied* 270 Kan. 901 (2000), the Court of Appeals considered essentially the same question and concluded that the convictions should not be disturbed.

"Our Supreme Court in *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994) (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]), stated:

' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]" '

"Under the doctrine set out in *Timley*, the record must contain substantial competent evidence proving all three means charged in order to uphold a conviction for kidnapping.

. . . .

"Despite the language of *Timley*, courts of appeal have attained a degree of confidence in jury verdicts of guilt in cases where there is overwhelming evidence supporting the conviction under one of the alternative means. Those courts have concluded that it was harmless error in such cases for the trial court to instruct on all alternatives.

"Our Supreme Court dealt with such a scenario in *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992). The *Grissom* court held that a general verdict of first-degree murder could be upheld if there was sufficient evidence to convict the defendant of either first-degree premeditated murder or felony murder, and the State was not required to prove both. 251 Kan. at 891.

"*Grissom* adopted the view taken by the United States Supreme Court in *Griffin v. United States*, 502 U.S. 46, 59-60, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), with the following:

' "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence [citation omitted]. . . ."

' "[I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction." ' 251 Kan. at 892.

"A recent 10th Circuit Court of Appeals opinion involving convictions for various conspiracy and mail fraud charges ruled that it was harmless error under the facts of that case where the trial court submitted a properly defined, although factually unsupported, legal theory to the jury along with a properly supported

basis of liability. See *United States v. Hanzlicek*, 187 F.3d 1228, 1236 (10th Cir. 1999).

"This court, in *State v. Ice*, 27 Kan. App. 2d 1, 6, 997 P.2d 737 (2000), when pondering a rape conviction, after reviewing *Griffin*, concluded that, where one of the possible bases of conviction was neither unconstitutional nor illegal, but 'merely unsupported by sufficient evidence,' there is no constitutional problem with upholding the conviction. The *Ice* court distinguished its opinion from *Griffin* with the following:

'This case differs from those where there was strong evidence supporting one theory and none on another, such as in *Griffin*. In a *Griffin* situation, one can reasonably assume the jury did not behave capriciously and convict on a theory in which there was no evidence, when there was strong evidence supporting another theory.' 27 Kan. App. 2d at 7.

"The task before the jury in this case was to determine whether Johnson was guilty of kidnapping. One cannot tell from the verdict what the basis for that verdict is; however, under the cases cited above, this court can reasonably conclude the jury picked the basis of kidnapping by threat which is supported by overwhelming evidence, rather than by means of force or deception for which there is little or no evidence. K.S.A. 60-261 defines harmless error as any error by a court which is not inconsistent with substantial justice. We conclude, therefore, that including the term 'deception' as a means of kidnapping in the jury instructions in this case constitutes harmless error. In light of the overwhelming evidence of Johnson's guilt on the kidnapping charge, we can see no injustice done by this verdict." *Johnson*, 27 Kan. App. 2d at 923-26.

Here, like *Grissom*, there was strong evidence supporting at least one theory of each burglary and no evidence of at least one other theory. Thus, following *Grissom*, the erroneous burglary instructions in this case were harmless.

## 8. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN EXCLUDING EVIDENCE?

Terry Jones testified that he did not want to testify in Dixon's case and received no benefit from doing so. For the purpose of impeachment, Dixon sought to introduce a copy of Jones' motion seeking a downward departure in his sentence for his cooperating with the State. Jones' motion recites that he "has provided information and testified on another matter in another jurisdiction." When asked by the trial judge about the hearsay implications, defense counsel conceded that the exhibit was being offered for the truth of its statement that Jones had cooperated with the State in

order to get his sentence reduced. After consulting with cocounsel, defense counsel suggested that it was admissible under the content-of-an-official-record exception to the hearsay record. The trial judge disagreed:

"Yes, if we're talking about an official record, but we're talking about a pleading made by an attorney filed in court. And it strikes me that if I buy your argument that 60-460 applies in this case that all I do to make something a truthful argument to be used against somebody is I go up and I file a pleading and I have it certified and then anybody can use it for anything."

The State echoed the trial judge's view in stating that the motion documented Jones' attorney's belief rather than Jones', and the State added that it therefore was not relevant to impeach Jones. The trial judge declined to admit the document:

"It's bad hearsay, but as a practical matter, given the rather vague nature of this, I can't tell that there is any relevance to this proceeding that we have before us. But if you want to make the efforts to re-call Mr. Jones and shore this up or to modify it in some way beyond what you can, which I am not very doubtful that you're going to get much more out of Mr. Jones than you've already got because he's denied he's testified for anybody on anything, you can do so . . . ."

Defense counsel assured the trial judge that he could be ready the next morning to do whatever further examination of Jones he was going to do.

The next morning, defense counsel again offered the document into evidence, relying on a previously uncited hearsay exception—the statement concerned a matter within the scope of an agency of the parties. The trial court again refused admission. Defense counsel recalled Jones, who testified that he had provided testimony in no other case. Jones, who the day before had said that he did not approve of the downward departure motion being based on his cooperation in another case, further testified that he had not objected at his sentencing proceeding to the basis of the motion.

The admission or exclusion of evidence lies within the sound discretion of the trial court. One who asserts that the court abused its discretion bears the burden of showing such abuse. *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002). Dixon contends that the trial court abused its discretion in refusing to admit the

document because it was not hearsay and its exclusion impinged his right to confront the witness.

Although at trial the motion was offered as an exception to the hearsay rule, on appeal Dixon contends that the motion was not hearsay. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different objection. *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002). For this reason, we do not consider the argument Dixon makes on appeal. In any event, it does not appear that admission of the document would have added much, if anything, to the testimony. Thus, even if Dixon had made the proper objection at trial, he has not shown that the trial court abused its discretion in excluding the motion from evidence.

## 9. DID THE TRIAL COURT ABUSE ITS DISCRETION IN PERMITTING JERRY HALL TO TESTIFY?

During cross-examination, Jerry Hall was shown his Kansas Sentencing Guidelines Journal Entry of Judgment. He agreed that his probation order included that he would "testify on behalf of the State of Kansas in a consistent and truthful manner as set forth in his inquisition."

The trial judge overruled Dixon's motion in limine, which sought to prevent Hall from testifying at trial on the ground that the probation order placed him under a strong compulsion to testify in a particular way. At trial, defense counsel's renewed objection to Hall's testifying was overruled. The trial court refused to admit Hall's sentencing journal entry on the ground "it was made quite clear to the jury" that Hall was obligated to testify in a truthful manner consistent with his inquisition testimony. On appeal, Dixon contends that the trial court abused its discretion in permitting Hall to testify and in excluding the journal entry.

K.S.A. 2004 Supp. 22-3101 sets out the procedure for inquisitions in criminal cases. Subsection (3) provides that "[e]ach witness shall be sworn to make true answers to all questions propounded to such witness touching the matters under investigation. The testimony of each witness shall be reduced to writing and signed by the witness."

Dixon relies on *State v. Fisher*, 176 Ariz. 69, 74, 859 P.2d 179 (1993), in arguing that the consistency requirement undermined the reliability of Hall's testimony by pressuring him with the threat of imprisonment to persist in one version of the facts. In *Fisher*, Fisher's wife entered into a plea agreement "conditioned on an avowal by [her] that if she is called as a witness in the trial of [her husband,] James Fisher, and required to testify, her testimony will not vary substantially in relevant areas to the statements previously given to investigative officers . . . ." 176 Ariz. at 80. The Arizona Supreme Court disapproved of the agreement:

"Agreements such as the one involved here undermine the reliability and fairness of the trial and plea bargaining processes and taint the truth-seeking function of the courts by placing undue pressure on witnesses to stick with one version of the facts regardless of its truthfulness. The constraints imposed upon the witness bound by a promise to testify with consistency frustrate the jury's duty to determine the credibility of the witness. . . .

". . . The prosecution should have bargained with [Fisher's wife] only for truthful and accurate testimony. Such an agreement maintains the integrity of the plea agreement process and promotes a fair trial without encouraging unreliable testimony." 176 Ariz. at 74.

Hall's probation order differs from the agreement in *Fisher* in requiring the witness to testify consistently with sworn testimony rather than with statements given to law enforcement officers. Thus, where the Arizona court was concerned that the agreement required the witness to stick with one story *regardless of its truthfulness*, requiring the witness to testify consistently with previous sworn testimony might seem to alleviate or abate questions about the truthfulness of the previous testimony. In *State v. Rivera*, 207 Ariz. 383, 388, 86 P.3d 963 (Ariz. App. 2004), however, the Arizona Court of Appeals refused to distinguish *Fisher* on the ground that the *Rivera* witnesses agreed to testify truthfully as well as consistently with previous statements:

"We do not agree that such a distinction meaningfully addresses the concerns that gave rise to the law expressed in *Fisher*. *Fisher* is designed to preserve the role of a trial as the crucible by which a jury evaluates the truthfulness of testimony. *See* 176 Ariz. at 74, 859 P.2d at 184. Thus, *Fisher* prohibits the State from "pre-scripting" testimony by conditioning a witness's plea agreement on her rendition of a particular version of events. *Id*. Even if the witness avers in her plea

agreement that the specified version of events is true and that the witness will so testify at trial, that avowal is made when the witness is not subject to the testing and confrontation her testimony would receive at trial. Once having entered the agreement, however, the witness is compelled by the desire to preserve her plea agreement to hold to the specified version of events at trial regardless of its truth."

The State, stating that there is a split in authority as to whether a consistency agreement affects a defendant's right to a fair trial, places its reliance on *People v. Jones*, 236 Mich. App. 396, 600 N.W.2d 652 (1999), *app. denied* 461 Mich. 994 (2000), as counter to the Arizona cases. In *Jones*, four witnesses entered into use immunity agreements that provided as follows:

" 'IN THE MATTER OF [Witness], that if [Witness] provides a truthful statement to the Detroit Police Department concerning his knowledge of the killing of Tyrone [sic] Hackett and testifies truthfully in all trials, proceedings and hearings in connection with that killing the Wayne County Prosecutor's Office will not use [Witness'] testimony to bring charges against him.' " 236 Mich. App. at 399.

The Court of Appeals commented on the language of the agreements:

"While it would appear from the text of the immunity agreements that the witnesses agreed to give a truthful statement to the police *in the future*, that was not the agreement contemplated by the parties. It is undisputed that the police statements referred to in the immunity agreements were those given by the witnesses when they were first arrested." 236 Mich. App. at 399.

The trial court granted a new trial on the ground that the prosecutor's actions with regard to the immunity agreements deprived the defendant of a fair trial. The Michigan Court of Appeals disagreed and held that the immunity agreements had not resulted in a miscarriage of justice. 236 Mich. App. at 404-09.

The circumstances of the present case differ somewhat from those in *Jones* and cases discussed in *Jones* in that what is at issue is consistent and truthful testimony as a condition of Hall's probation rather than as a term of a plea agreement. Thus, with regard to the probation order, there was incentive for Hall to confirm his prior account but no balancing incentive that he not enter into an agreement unless his prior account was true. Examination of the record, however, shows that Hall's plea agreement also contained the requirement that he "testify on behalf of the State in a consis-

tent and truthful manner as set forth in his inquisition in any trial that he is requested to do so by the State."

The State incorporates *Jones* into its argument by stating that the *Jones* court approved a three-part test to determine if a consistency agreement violates a defendant's constitutional rights and then applying the test to the facts of the present case. In fact, the three-part test touted by the State is not the test applied by the Michigan court, but is instead only one factor considered by the court. That factor consists of three safeguards of a defendant's right to a fair trial said by the Michigan court to be used when the State gives a witness something in exchange for his or her testimony:

"These safeguards include (1) full disclosure of the terms of the agreements struck with such witnesses, (2) the opportunity for full cross-examination of such witnesses regarding the agreements and their effect, and (3) instructions cautioning the jury to carefully evaluate the credibility of witnesses who have been induced by agreements with the prosecution to testify against the defendant." [Citations omitted.] 236 Mich. App. at 405.

The State contends that the three procedural safeguards were followed in the present case. There was (1) full disclosure of the terms of the agreement, (2) the opportunity for full cross-examination of Hall, and (3) an instruction cautioning the jury to carefully evaluate the credibility of accomplice witnesses. Dixon argues that, because he was not permitted to introduce Hall's probation order and confront him with it; he did not have the opportunity to fully cross-examine Hall about it. Review of the cross-examination of Hall, however, shows that defense counsel handed Hall the sentencing journal entry at issue here and questioned him about it. Defense counsel also questioned Hall about the pertinent terms of his plea agreement. It appears that there was a full opportunity to cross-examine the witness. With regard to a cautionary instruction, Dixon contends that the accomplice witness instruction did not satisfactorily safeguard his right to a fair trial because it did not caution the jury to carefully evaluate the credibility of a witness who had been induced by an agreement with the prosecution and an attendant probation condition to testify against him.

The Michigan court, in approving a bargain for specific testimony, reasoned that the prosecution ought to be able to proceed

with certainty in the truthfulness of a witness' pretrial statement. See 236 Mich. App. at 405-08. The Nebraska Supreme Court, in *State v. Burchett*, 224 Neb. 444, 456, 399 N.W.2d 258 (1986), also reasoned that the prosecution ought to be able to rely on the truthfulness of a witness' pretrial statement. But the Nebraska court did not conclude, as a result, that a bargain for specific testimony was acceptable. The Nebraska court considered a challenge to the testimony of an accomplice witness who had given several different versions of the crime before implicating the defendant. The Nebraska court recognized that the prosecutor treated the final version as truthful for purposes of the plea agreement entered into with the witness and as part of the agreement required the witness' truthful testimony. The prosecutor, however, did not include in the bargain a requirement that the witness testify consistently with his final statement. In the court's view, if the witness had been required to testify in conformance with his final statement, his testimony would be so tainted as to require its preclusion. Because the requirement was that the witness testify truthfully, his testimony was admissible. 224 Neb. at 456-57.

We think that *Fisher* and *Rivera* represent the better view. Plea agreements may only be conditional upon the accomplice witness testifying completely and truthfully, and consistency provisions in such agreements are not enforceable. As noted in *Rivera*, this does not leave the prosecutor without an effective remedy should the accomplice witness change his or her testimony at trial:

"The recourse the State has in such a circumstance is to impeach the witness with her previous statements. It would then be the jury's duty to determine which version of the witnesses's account to credit, if any. Of course, by changing her testimony from that of a previous version, the accomplice witness would put at issue whether she had testified truthfully at trial, and thus whether she had complied with the terms of her plea agreement and was entitled to receive the benefit of that plea agreement." 207 Ariz. at 389.

As to retrial, the court held:

"[T]he State cannot introduce the testimony of Valenzuela or Saiz from the previous trial to establish Rivera's guilt. Additionally, to establish Rivera's guilt the State cannot introduce any statements made by Valenzuela or Saiz after they

entered their plea agreements and before any taint caused by the consistency provisions in their plea agreements has been removed.

. . . .

"[W]e similarly find no reason to preclude the testimony of Valenzuela and Saiz during the new trial if the court takes appropriate steps to remove the taint of the improper provisions. As the facts of this case demonstrate, the accomplice witness herself must be informed that the consistency provision is unenforceable prior to her testimony. If she is not so informed, and thus testifies under the belief that the clause is valid, her testimony will still be tainted by the consistency provision. To 'not enforc[e] the offending clause' and to make 'full disclosure of the terms and circumstances of the agreement,' a trial court is obliged by *Fisher* to ensure that the witness, any counsel she may have, the parties to the underlying prosecution, and, in appropriate cases, the jury in the underlying prosecution, are aware that any consistency provision in a plea agreement entered by an accomplice witness cannot be enforced. [176 Ariz.] at 76, 859 P.2d at 186. The State may only condition plea agreements on the completeness and truthfulness of any proffered testimony. This course of action removes any motivation for the accomplice witness to provide particular testimony and will appropriately protect Rivera's rights while also allowing the State to fairly re-prosecute its charges against Rivera." 207 Ariz. at 391.

We conclude that it was error to allow Jerry Hall to testify. However, since Hall's testimony was basically the same as that of Rodney Hayes, the error was harmless. We are reversing on other grounds, and, upon retrial, the State is precluded from using Hall's trial testimony or any statements made after he entered into the plea agreement. The provision stating that he would "testify on behalf of the State of Kansas in a consistent and truthful manner as set forth in his inquisition" is unenforceable. Hall may testify if, upon retrial, the trial court takes the necessary steps to ensure that Hall, his counsel, the prosecutor, and, if appropriate, the jury, are aware that the consistency provision in the plea agreement and probation order cannot be enforced.

## 10. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN ALLOWING THE PATHOLOGIST TO TESTIFY THAT THE VICTIMS' DEATHS WERE HOMICIDES?

Dr. Erik Mitchell testified that the *cause* of the deaths of Dana and Gabriel Hudson was exposure to heat and inhalation of fire gases. Over the objection of defense counsel, Dr. Mitchell was also allowed to testify that the *manner* of each death was homicide.

Dixon's principal argument on appeal is that, although the pathologist was qualified by his medical training and his performing the autopsy to render an opinion on the cause of death, Mitchell was not qualified to determine the cause of the explosion and fire in order to form the opinion that the deaths were homicides. Citing *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), and *Cimarron Feeders v. Bolle*, 28 Kan. App. 2d 439, 17 P.3d 957, *rev. denied* 271 Kan. 1035 (2001), which involve opinion testimony of experts on an ultimate issue, Dixon also argues that Mitchell's classification of the deaths invaded the province of the jury.

In *Bressman*, the defendant was charged with the rape of Mrs. T. All the tests customarily made to determine whether sexual acts had taken place were negative, and there was no evidence of trauma. The doctor who examined Mrs. T at the hospital was erroneously allowed to testify that in her opinion Mrs. T. was raped. The opinion testimony of an expert on the ultimate issue is admissible only if it will aid the jury in interpreting technical matters or in understanding the evidence. The opinion testimony of an expert also must be based on the witness' expertise. Even though the doctor was not trained in psychiatry, her opinions were based on Mrs. T's story rather than on the physical examination. The *Bressman* court concluded that the normal experiences of jurors would permit them to draw proper conclusions from the evidence without the aid of the doctor's opinion testimony. 236 Kan. at 303-04. In *Cimarron Feeders*, an accounting expert testified that a revised operating agreement and promissory note, from which the dispute arose, was "probably fair." 28 Kan. App. 2d at 449. The Court of Appeals concluded that the accountant's opinion invaded the province of the jury because the "fairness" of the agreement and note was a matter within the normal experience possessed by jurors. 28 Kan. App. 2d at 449. The Court of Appeals believed that the erroneous expert testimony may have been harmless as an isolated instance but that the totality of circumstances and cumulative trial court errors required reversal. 28 Kan. App. 2d at 451.

The State generally takes the position that there is a split of authority on this issue and, if Mitchell's opinion on the manner of death was erroneously admitted, it is harmless error. The 1976

annotation cited by the State, 71 A.L.R.3d 1265, discusses the admissibility of testimony of coroners and morticians as to the cause of death in homicide prosecutions at a time, it appears, when coroners tended to lack medical training. The State also mentions that Dr. Mitchell is a coroner and that he was required by K.S.A. 2004 Supp. 22a-232 to investigate and report on the cause of death. The State cites *State v. Mondaine*, 655 S.W.2d 540 (Mo. App. 1983), for the proposition that Mitchell was qualified to testify as to the manner of death. *Mondaine* does not support the State's position. The issue in *Mondaine* was the sufficiency of the evidence of the cause of death. The coroner's testimony established death by asphyxiation, and eyewitness testimony established that the victim had been strangled. The combined testimony of those witnesses along with evidence of the condition of the victim's body, established strangulation as the cause of death. The Missouri court concluded that opinion testimony as to causation was admissible despite its not going beyond mere possibility as long as it was corroborated. 655 S.W.2d at 543.

The admissibility of expert testimony lies within the sound discretion of the trial court, and its determination will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Shaw*, 260 Kan. 396, 398, 921 P.2d 779 (1996).

K.S.A. 60-456(b) provides: "If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." To satisfy subsection (1), the prosecutor asked Mitchell whether he reviewed the police investigation reports and investigation findings. Mitchell testified that he had and that he did so in "[t]rying to figure the sequence of events, what is and is not known as possible in the sequence of events that led to these people's demise." The prosecutor followed up by asking, "Do you need that information to then determine for the cause of death or, excuse me, for the conclusion required under Kansas law to state manner of death?" The witness answered, "I include that, yes."

Mitchell is the district coroner for Lyon County. He testified that a coroner is responsible for investigating any death within his or her jurisdiction where the State has some interest in the death and that he is responsible for determining the "cause and manner of death as stated in the statute." Asked to distinguish cause from manner, Mitchell stated that "[c]ause is what kills you" and "[m]anner of death defines the circumstances under which the cause results in your death." He gave the following examples:

"[S]omebody could point a gun at you, pull the trigger, kill you. The cause would be the gunshot injury. The manner in that sequence would be a homicide. You could drop a gun, it would discharge because it's, let's say, improperly constructed, the bullet strikes you. The cause of death will be the gunshot. The manner of that instance will be accident. You could get tired of it all, point a gun at yourself, discharge the firearm. The cause of death, what killed you, would be the gunshot. The manner under those circumstances would be suicide."

He testified that he was required under Kansas law to file a death certificate with the Office of Vital Statistics. Over defense counsel's objections, the death certificates of Dana and Gabriel Hudson were admitted into evidence. The forms have a space for the "Manner of Death" with six possibilities listed: natural, accident, suicide, homicide, pending investigation, and could not be determined. On the certificates for Dana and Gabriel Hudson, there is an "x" in the box for homicide.

The admissibility of a coroner's report of death was an issue in *State v. Hobbs*, 276 Kan. 44, 71 P.3d 1140 (2003). Hobbs was convicted of involuntary manslaughter in the death of Jathan Stevenson. Hobbs argued that the trial court erred in not allowing into evidence the county coroner's report of death for Stevenson, who died when the vehicle in which he was riding was struck by Hobbs' vehicle. In the coroner's report, Stevenson's manner of death was classified as an accident. In refusing to admit the document, the trial judge told defense counsel that he was "not going to allow [him] to put that into evidence to show this was an accident." 276 Kan. at 52. On appeal, Hobbs revealed that his purpose in offering the document indeed was to show that "the State's own investigators . . . concluded that this was a traffic accident, not a murder as charged by the prosecution." 276 Kan. at 52. This court

concluded that the report was an official court record admissible (see K.S.A. 2004 Supp. 60-460[o], which is the hearsay exception for the content of official records) and that it was relevant. Thus, the trial court's exclusion of the report was error, but this court concluded that it was harmless error. Under the harmless error rule of K.S.A. 60-261, a trial court's error in the admission of evidence is not grounds for reversal unless failure to set aside the verdict appears inconsistent with substantial justice. *State v. Mullins*, 267 Kan. 84, Syl. ¶ 4, 977 P.2d 931 (1999). In *Hobbs*, the exclusion of the coroner's report did not prejudice the defendant's substantial rights and was not inconsistent with substantial justice. 276 Kan. at 53.

The State's reference in the present case to K.S.A. 2004 Supp. 22a-232 is to the statute requiring the sort of death report likely involved in *Hobbs*. K.S.A. 2004 Supp. 22a-232(a) requires a coroner to "make inquiries regarding the cause of death and reduce the findings to a report in writing" to be filed with the clerk of the district court of the county in which the death occurred. The documents that were admitted into evidence in the present case were death certificates, which are required to be filed with the state registrar and are the official death records. See K.S.A. 65-2412. K.S.A. 65-2416(b) provides that "the state registrar shall not certify a death certificate in which the manner of death is marked other than natural unless the death certificate is signed by a district coroner." Mitchell, as the district coroner, was required to sign the death certificates of Dana and Gabriel Hudson, and, as a matter of law, he was qualified to do so. The death certificates, which classify the deaths as homicides, were admitted into evidence. Dixon does not complain of their admission. If admission of Mitchell's testimony as to the manner of death was error for any reason, the error would be harmless because the testimony merely restated the contents of the death certificates. There was no abuse of discretion in permitting Mitchell to testify as to the manner of death.

11. SHOULD THE JURY HAVE BEEN INSTRUCTED, AS DEFENDANT REQUESTED, THAT JERRY HALL'S PLEA

AGREEMENT DOES NOT GUARANTEE THAT HIS TESTI-
MONY IS TRUTHFUL?

The following instruction was included in the package of re-
quested instructions filed by Dixon:

"Witness Jerry Hall has testified pursuant to a plea agreement which provides
that he must give truthful testimony in this case. That portion of Mr. Hall's plea
agreement does not guarantee that his testimony will be truthful. It is your duty
to determine the weight and credibility of Mr. Hall's testimony. The State has no
knowledge or information regarding the truthfulness of this testimony beyond that
which has been provided to you in the evidence presented during this trial."

The trial court did not give the instruction. On appeal, Dixon con-
tends that the instruction was necessary to counter the plea agree-
ment's implied representation by the State that Hall's testimony
would be truthful.

Our standard of review is, if the instructions taken together and
as a whole properly and fairly state the law as applied to the facts
of the case and a jury could not reasonably have been misled by
them, the instructions do not constitute reversible error even if
they are in some way erroneous. *State v. Peterson*, 273 Kan. 217,
221, 42 P.3d 137 (2002).

The State contends that the trial court's instructions on the cred-
ibility of witnesses and the testimony of an accomplice sufficiently
informed the jurors to exercise caution in assessing Hall's testi-
mony. The jury was instructed: "It is for you to determine the
weight and credit to be given the testimony of each witness. You
have a right to use common knowledge and experience in regard
to the matter about which a witness has testified." It was further
instructed: "An accomplice witness is one who testifies that he was
involved in the commission of the crime with which Mr. Dixon is
charged. You should consider with caution the testimony of an
accomplice."

Dixon relies on *Commonwealth v. Ciampa*, 406 Mass. 257, 547
N.E.2d 314 (1989), to support his contention the jury should have
been instructed that the plea agreement did not guarantee the
truthfulness of Hall's testimony. In *Ciampa*, the government's case
depended greatly on the credibility of a witness named De-
Vincenzi. The jury deliberated for 4 days and asked for further

instructions on determining the credibility of witnesses. In *Ciampa*, unlike the present case, the agreement was admitted into evidence and various provisions of the agreement that spuriously bolstered the credibility of DeVincenzi should have been redacted but were not. Over objection, the prosecutor read the agreement to De-Vincenzi and asked him about his understanding of each paragraph. Then, also over objection, the prosecutor introduced DeVincenzi's testimony that his attorney signed a statement representing that DeVincenzi understood the agreement, his attorney had reviewed the agreement with him, and his attorney believed DeVincenzi's decision to enter into the agreement to be an informed and voluntary one. The Massachusetts court concluded that the defendant was prejudiced "from admission of the plea agreement with damaging provisions not deleted and from De-Vincenzi's testimony concerning his attorney's involvement with the plea agreement." 406 Mass. at 263. The Massachusetts court further concluded that such prejudice "was not alleviated by the judge's charge." 406 Mass. at 263.

*Ciampa* is distinguishable from the present case on a number of counts. In this case, the State's case did not depend heavily on Hall's testimony—because Hall did not accompany Dixon during the second burglary of Alicia's apartment, he had no testimony to offer relevant to the cause of the explosion and fire. The questions asked by the jurors in this case include no expression of concern about determining the credibility of witnesses. Neither the plea agreement nor the journal entry of sentencing for Hall was admitted into evidence. There was no implication that Hall's attorney vouched for his truthfulness. Thus, the prejudice found by the Massachusetts court is not apparent in the present case. Because the trial court did not need to alleviate prejudice with cautionary instructions in this case, the instructions deemed necessary by the Massachusetts court in *Ciampa* are extraneous. In this case, the instructions on the weight and credibility of witness testimony and accomplice testimony, taken together with all the other instructions, fairly stated the law as applied to the facts and a jury could not reasonably have been misled by them. The trial court did not commit error is not giving the requested instruction.

## 12. WAS THE EVIDENCE SUFFICIENT TO ESTABLISH THAT DIXON WAS CRIMINALLY RESPONSIBLE FOR THE EXPLOSION AND FIRE?

Dixon contends that the State's evidence showed that he was in Alicia's apartment in the early morning hours of July 29 and that a malfunction of the stove caused the natural gas explosion, but that the evidence did not prove that he caused the explosion. The State's response is that this issue is moot because Dixon was not convicted of aggravated arson. The evidence that Dixon caused gas to leak, which eventually exploded and fueled the fire was the basis for his convictions of felony murder for the deaths of Dana and Gabriel Hudson and of aggravated battery for the five injured victims. Hence, evidence showing that Dixon was criminally responsible for the explosion and fire was essential to the case.

There are several related aspects to Dixon's argument. First, he states that there is no evidence that he left anything in Alicia's apartment that ignited gas from the stove. Second, he suggests that an extinguished pilot light on the stove or an open burner or two may have been the source of the gas leak. Third, he states that there was scientific evidence that the stove was upright rather than on its side at the time of the explosion. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

After reviewing all the evidence, viewed in the light most favorable to the prosecution, we determine the State showed by the process of elimination and by the appearance of the debris field that it was a natural gas explosion and by the testimony of Griffin that Dixon overturned the stove, which, it may reasonably be inferred, damaged the gas supply pipe allowing escaping gas to create an extremely volatile condition where the proportion of natural gas to air required only a spark for combustion. Agent Lobdell determined that the fuel-air explosion and the fire originated in Alicia's

apartment. He concluded that it was Dixon's fracturing of the pipe that caused the gas leak after ruling out other possible explanations: If Alicia had left her stove with an extinguished pilot light or a leaking burner, gas would have been apparent in the kitchen during the first burglary. Hall did not smell gas during the first burglary. Lobdell ruled out sources other than the stove pipe for the escaped gas, including the hot water heater, furnace, and other appliances. Tests for liquid accelerants were negative except for one insignificant sample from the debris in the basement, which probably was a can or bottle of some commercial product containing petroleum distillates. By the condition of remaining furniture, he determined that the point of ignition was not in the basement. Then Lobdell determined from the gas meter to Alicia's apartment that approximately 1,000 cubic feet more natural gas flowed into her apartment during July than to any of the other apartments.

The State was unable to show what actually touched off the explosion. Lobdell testified that there was no scientific way to determine what ignited the explosion and that it commonly was not possible to do so "because what caused the ignition was destroyed in the resulting fire." But it was not essential for the State to show that Dixon ignited the gas because the State did show that Dixon's actions caused gas to be present in explosive quantities. From the absence of a person's death or injury in Alicia's apartment, the jury could have reasonably inferred that the gas was not ignited by human action but rather from a spark from some nonhuman source. Viewing all the evidence in the light most favorable to the prosecution, as we must, and keeping in mind that a conviction of even the gravest offense may be sustained by circumstantial evidence, *State v. Davis*, 275 Kan. 107, 118, 61 P.3d 701 (2003), we conclude that the evidence in this case sufficiently established Dixon's criminal responsibility for the explosion and fire.

## 13. DID CUMULATIVE ERRORS DEPRIVE DIXON OF A FAIR TRIAL?

As we have previously found reversible error, we do not reach this cumulative error issue.

Affirmed in part, reversed in part, and remanded for a new trial.

Nuss, Luckert, and Gernon, JJ., not participating.

J. Patrick Brazil, S.J., assigned.∎

Gary Rulon, C.J., assigned.∎

Beier, J., concurring in part and dissenting in part: I concur in the majority's result and rationale as to all of the defendant's convictions except the two burglaries.

Although I was a member of the Court of Appeals panel that decided *State v. Johnson*, 27 Kan. App. 2d 921, 11 P.3d 67, *rev. denied* 270 Kan. 901 (2000), which relied on *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992), to affirm a conviction based on alternative means despite insufficient evidence on one of the means, I have since come to believe that *Johnson* and *Grissom* were wrongly decided on this point. I would take this opportunity to disapprove *Johnson* and overrule *Grissom* for all of the reasons I have set forth in my article on multiple acts and alternative means cases. See Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 297-99 (2005). And I would reverse the defendant's two burglary convictions as a straightforward and consistent application of our alternative means rule from *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994).

Rulon, C.J., dissenting: While I agree with the majority there were errors in this trial, given the *overwhelming* nature of the evidence of guilt, the errors were harmless. See *State v. Lumley*, 266 Kan. 939, 959, 976 P.2d 486 (1999). I would affirm the convictions without any reservation.